GEORGE A. QUESINBERRY, JR.

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 901257 and 901258

March 1, 1991

Present: All the Justices

Record No. 901257 —
Record No. 901258 —

*Matthew N. Ott (F. G. Rockwell, III; Hairfield, Morton, Allen & Rockwell, on brief), for appellant.*

*Marla Lynn Graff, Assistant Attorney General (Mary Sue Terry, Attorney General; John H. McLees, Jr., Assistant Attorney General, on brief), for appellee.*

JUSTICE HASSELL delivered the opinion of the Court.

On appeal, we review the capital murder conviction and death sentence imposed upon George Adrian Quesinberry, Jr. for the murder of Thomas L. Haynes.

## I. PROCEEDINGS

On January 22, 1990, Quesinberry was indicted by a Chesterfield County grand jury for capital murder under former Code § 18.2-31(d), now Code § 18.2-31(4)[1], breaking and entering with the intent to commit larceny, robbery, and use of a firearm in the commissions of burglary, robbery, and murder. At the conclusion of the first stage of a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, the jury convicted Quesinberry of all offenses. The jury fixed his punishment as follows: life imprisonment for robbery; 20 years imprisonment for breaking and entering; and two years imprisonment on each of the firearms convictions for a total of six years.

At the penalty phase of the capital murder trial, after hearing evidence in aggravation and mitigation, the jury fixed Quesinberry's punishment at death for capital murder. After reviewing a probation officer's report, the trial court, on September 11, 1990, entered final judgments confirming the convictions and imposing the penalties fixed by the jury.

---

[1] Code § 18.2-31(4) defines capital murder as: "[t]he willful, deliberate, and premeditated killing of any person in the commission of robbery or attempted robbery while armed with a deadly weapon."

We have consolidated the automatic review of Quesinberry's death penalty with his appeal of the capital murder conviction in Record No. 901257, Code § 17-110.1(A) and (F), and have given them priority on the docket, Code § 17-110.2. We have also certified from the Court of Appeals of Virginia Quesinberry's appeal of his robbery, breaking and entering, and firearm convictions, Record No. 901258, and have consolidated the two records for our consideration.

## II. THE EVIDENCE

Pursuant to established principles of appellate review, we will review the evidence in the light most favorable to the Commonwealth. On the evening of September 24, 1989, Quesinberry visited a friend who lived at Benny's Trailer Court in Prince George County. Eric Hinkle was also present. The three men drank rum and "got drunk." Quesinberry suggested to Hinkle that they "break into somewhere." Quesinberry and Hinkle decided to "break into" an office and warehouse owned by Tri-City Electric Company (Tri-City Electric) in Chesterfield County. Quesinberry had purchased electrical supplies from Tri-City Electric and was familiar with its premises.

Quesinberry and Hinkle left the trailer park and went to Quesinberry's stepmother's home in Dinwiddie County, where he lived. Quesinberry obtained his .45-caliber semi-automatic pistol with a clip containing six rounds from his stepmother's house. Quesinberry took his pistol "more or less for . . . security . . . . just to maybe scare somebody or whatever."

Quesinberry and Hinkle then went to Tri-City Electric. They arrived at approximately 6:00 a.m. on September 25, 1989. Quesinberry pried a rear door open with a screwdriver, and the men went inside. They rummaged through offices, opening doors and drawers, looking for "a cash box or somethin[g]." Quesinberry entered an office and found two "walkie talkies." He took them because he thought that they might be valuable. Quesinberry and Hinkle then entered a second office where they found a desk with a locked drawer. Using his pistol, Quesinberry fired a shot which broke the lock on the drawer. He then gave his pistol to Hinkle while he (Quesinberry) searched a file cabinet. Quesinberry found a box of money in the cabinet.

Haynes, the owner of Tri-City Electric, arrived on the premises while Quesinberry and Hinkle were in the second office. Haynes

turned on the lights, saw them and asked, "[H]ey, what are ya'll doin[g]?" Quesinberry immediately told Hinkle: "[S]hoot him or somethin[g]." Hinkle did not do so. Quesinberry took the pistol from Hinkle and began shooting at Haynes. Haynes ran. Quesinberry chased him through the warehouse, shooting as Haynes tried to flee. Haynes had no weapon and made no aggressive movement towards Quesinberry.

Quesinberry shot Haynes twice in the back. One gunshot wound severed his spinal cord, paralyzing his legs. The other gunshot wound was administered with the muzzle of the pistol pressed against Haynes' back.

Quesinberry returned to the office where he and Hinkle had found the box of money. Quesinberry picked up the box and a roll of stamps which they had found in a desk. As they were leaving the premises, Haynes, who was lying on the floor, tried to push himself up. Quesinberry hit Haynes in the head at least twice with the pistol. The impact of these blows caused a curved impression in Haynes' skull.

Quesinberry and Hinkle left the warehouse and got in a car which they had parked across the street. They returned to Quesinberry's stepmother's home. They parked the car in a wooded area near the house and waited for her to leave. Quesinberry then fell asleep in the car. They went in the house after Quesinberry's stepmother had left and divided approximately $200 in coins they had taken from Tri-City Electric.

At 6:30 a.m. on September 25, an employee of Tri-City Electric entered the office and warehouse and discovered Haynes lying on the floor in the dark. Haynes, who was still alive, told the employee that he had been shot and that he recognized one of the perpetrators but did not know his name. Haynes died later that morning from injuries caused by the bullet wounds.

About 7:00 p.m. on September 25, Hinkle turned himself in to the police and gave a statement which implicated Quesinberry. A search warrant was issued for a search of Quesinberry's home and a warrant was obtained for his arrest. The police arrived at Quesinberry's home about 2:30 a.m. on September 26, 1989. Quesinberry was shown the warrants. He informed the police that he knew what they wanted and he "would tell [them] where it was if [they] just wouldn't tell his mother." Quesinberry told the police officers that he had placed the pistol and money in his brother's car. He identified the pistol, which the police found in his

brother's car, as the weapon he used to kill Haynes. He also iden-
tified money and stamps, which were found in the car, as property
stolen from Tri-City Electric. After being advised of his constitu-
tional rights, he signed a written waiver and gave a detailed state-
ment to the police which described his involvement in the crimes.

## III. ASSIGNMENTS OF ERROR WAIVED

■ Quesinberry is deemed to have waived Assignments of Error
9, 13, 20, and 24.[2] Despite assigning error to these issues, Quesin-
berry failed to argue them on brief. Therefore, pursuant to Rule
5:27(e), we will not consider them on appeal. *Eaton* v. *Common-
wealth*, 240 Va. 236, 245, 397 S.E.2d 385, 390 (1990); *Cheng* v.
*Commonwealth*, 240 Va. 26, 41, 393 S.E.2d 599, 607 (1990).

## IV. ISSUES PREVIOUSLY DECIDED

■ Quesinberry raised certain issues on appeal which have been
decided adversely to his claims by our previous decisions. We ad-
here to those rulings and we will not discuss them further here.
The issues previously resolved are:

(1) Whether the death penalty, per se, constitutes cruel and un-
usual punishment in contravention of the Eighth Amendment. *See
Spencer* v. *Commonwealth*, 240 Va. 78, 84, 393 S.E.2d 609, 613
(1990) (*Spencer IV*), *cert. denied*, 498 U.S. ___, 111 S.Ct. 281
(1990); *Spencer* v. *Commonwealth*, 238 Va. 563, 568-69, 385
S.E.2d 850, 853 (1989) (*Spencer III*), *cert. denied*, 493 U.S.
1093, 110 S.Ct. 1171 (1990); *Spencer* v. *Commonwealth*, 238 Va.
275, 280-81, 384 S.E.2d 775, 777-78 (1989) (*Spencer I*), *cert. de-
nied*, 493 U.S. 1036, 110 S.Ct. 759 (1990) (compiling authority);
*Whitley* v. *Commonwealth*, 223 Va. 66, 77-78, 286 S.E.2d 162,
168-69, *cert. denied*, 459 U.S. 882 (1982).

---

[2] These assignments of error complained:

(9) That the trial court erred in not allowing Investigator Showalter to testify,
during the guilt phase, regarding certain statements made by Eric Hinkle;

(13) That the trial court erred in failing to instruct the jury as to second-degree
murder;

(20) That the trial court erred in allowing the Commonwealth to introduce the tes-
timony of Eric Hinkle; and

(24) That the trial court erred in failing to grant the defendant's proposed instruc-
tion on evidence in mitigation and evidence in extenuation.

(2) Whether §§ 19.2-264.2 through 19.2-264.5 of the Code of Virginia, as amended, 1950, violate the Eighth Amendment's prohibition against cruel and unusual punishment and the Fourteenth Amendment's guarantee of due process. *Spencer III*, 238 Va. at 568-69, 385 S.E.2d at 853; *Spencer v. Commonwealth*, 238 Va. 295, 302, 384 S.E.2d 785, 790 (1989) (*Spencer II*), cert. denied, 493 U.S. 1093, 110 S.Ct. 1171 (1990); *Pope v. Commonwealth*, 234 Va. 114, 121-22, 360 S.E.2d 352, 357 (1987), cert. denied, 485 U.S. 1015 (1988); *Briley v. Commonwealth*, 221 Va. 563, 577-80, 273 S.E.2d 57, 65-67 (1980); *M. Smith v. Commonwealth*, 219 Va. 455, 476-78, 248 S.E.2d 135, 148-49 (1978), cert. denied, 441 U.S. 967 (1979). *See generally Giarratano v. Procunier*, 891 F.2d 483, 489 (4th Cir. 1989), cert. denied, _____ U.S. _____, 111 S.Ct. 222 (1990); *Turner v. Bass*, 753 F.2d 342, 350-51 (4th Cir. 1985), *sentence vacated on other grounds*, 476 U.S. 28 (1986) (*citing Gregg v. Georgia*, 428 U.S. 153 (1976)).

(3) Whether the defendant should have been granted additional peremptory challenges. *See Spencer IV*, 240 Va. at 84-85, 393 S.E.2d at 613; *Buchanan v. Commonwealth*, 238 Va. 389, 405, 384 S.E.2d 757, 767 (1989), cert. denied, 493 U.S. 1063, 110 S.Ct. 880 (1990).

(4) Whether the trial court erred in not allowing Quesinberry to inform the jury and in failing to instruct the jury that imposition of a life sentence meant that Quesinberry would not be eligible for parole consideration for 30 years. *See Buchanan*, 238 Va. at 417, 384 S.E.2d at 773-74; *Poyner v. Commonwealth*, 229 Va. 401, 418-19, 329 S.E.2d 815, 828, cert. denied, 474 U.S. 865 and 474 U.S. 888 (1985).

## V. BILL OF PARTICULARS

Quesinberry filed a motion for a bill of particulars requesting that the trial court enter an order directing that the Commonwealth:

(1) Identify the grounds, and all of them, on which it contends that the defendant is guilty of capital murder.

(2) Identify the evidence, and all of it, upon which it intends to rely in seeking a conviction of the defendant upon the charge of capital murder.

(3) Identify the aggravating factors, if any, upon which it intends to rely in seeking the death penalty, should the defendant be convicted of capital murder.

(4) Identify the evidence, and all of it, on which it intends to rely in support of the aggravating factors identified, and all other evidence which it intends to introduce in support of its contention that death is the appropriate punishment for this defendant.

The trial court granted paragraphs (1) and (3) of Quesinberry's motion but denied paragraphs (2) and (4). Quesinberry argues that the trial court's failure to require the Commonwealth to file a bill of particulars as requested in paragraphs (2) and (4) constitutes error. We disagree.

Code § 19.2-230 states, in part: "A court of record *may* direct the filing of a bill of particulars at any time before trial." (Emphasis added.) Hence, a defendant is not entitled to a bill of particulars as a matter of right. Whether the Commonwealth is required to file a bill of particulars rests within the discretion of the trial court. "The purpose of a bill of particulars is to state sufficient facts regarding the crime to inform an accused in advance of the offense for which he is to be tried. He is entitled to no more." *Hevener v. Commonwealth*, 189 Va. 802, 814, 54 S.E.2d 893, 899 (1949). The trial court did not abuse its discretion when it denied paragraphs (2) and (4) of Quesinberry's motion. Quesinberry sought to use paragraphs (2) and (4) of his motion for a bill of particulars to expand the scope of discovery in a criminal case, and that is improper.

Quesinberry next argues that the trial court should have granted paragraph (2) of his motion for a bill of particulars because the capital murder indictment did not "detail the circumstances of the . . . robbery." However, the indictments and the Commonwealth's bill of particulars, filed in response to paragraph (1) of Quesinberry's motion, adequately stated sufficient facts regarding the crimes for which he was tried.

Quesinberry also argues that the trial court's refusal to order the Commonwealth to provide the information requested in paragraph (2) "served to prejudice Quesinberry . . . [and] . . . thereby denied him his right to a fair trial." We hold this argument is meritless. Counsel for Quesinberry acknowledged in the trial court that the Commonwealth and police investigators had

provided Quesinberry with "their entire file." We also hold that the bill of particulars filed by the Commonwealth in response to paragraph (3) of Quesinberry's motion stated sufficient facts regarding the crimes for which he was tried.

## VI. THE GUILT PROCEEDING

### A. Robbery

Quesinberry argues that the trial court erred in refusing to strike the Commonwealth's evidence because the property was taken before any acts of violence were committed against Haynes and, therefore, the robbery predicate for capital murder was not established. We disagree.

Robbery is "the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation." *Hoke* v. *Commonwealth*, 237 Va. 303, 310, 377 S.E.2d 595, 599, *cert. denied*, 491 U.S. 910 (1989) (quoting *Mason* v. *Commonwealth*, 200 Va. 253, 254, 105 S.E.2d 149, 150 (1958)). Additionally, we have stated:

> The distinctive elements of robbery are (1) the use of violence, or the threat thereof, against the victim, and (2) the theft of property from his person or in his presence. Theft of property is a trespass upon the rights of the owner therein for as long as he is deprived of the use thereof; he retains legal possession of the goods stolen even when they are in the actual possession of the thief [citation omitted]. In a robbery prosecution, where the violence against the victim and the trespass to his property combine in a continuing, unbroken sequence of events, the robbery itself continues as well for the same period of time.

*Linwood Earl Briley* v. *Commonwealth*, 221 Va. 532, 543, 273 S.E.2d 48, 55 (1980), *cert. denied*, 451 U.S. 1031 (1981).

In *Briley*, Linwood Briley and his cohorts stopped their victim outside a restaurant, robbed him at gunpoint, forced him into his own automobile, abducted him, and took him to an island located in the James River. Upon arrival at the island, approximately 15 to 20 minutes after the initial robbery, they shot him fatally. They drove away in his car, which they later stripped of parts and abandoned. We held that the murder was closely related in time, place, and causal connection to the robbery, making it a

part of the same criminal enterprise as a matter of law. *Id.* at 544, 273 S.E.2d at 56. Since *Briley*, we have affirmed convictions for capital murder during the commission of a robbery when the evidence was sufficient to support a conclusion that the killing and theft were interdependent objects of a common criminal design. *See Hoke*, 237 Va. at 310-11, 377 S.E.2d at 600; *Wise v. Commonwealth*, 230 Va. 322, 334, 337 S.E.2d 715, 723 (1985), *cert. denied*, 475 U.S. 1112 (1986); *Edmonds v. Commonwealth*, 229 Va. 303, 310, 329 S.E.2d 807, 812-13, *cert. denied*, 474 U.S. 975 (1985); *LeVasseur v. Commonwealth*, 225 Va. 564, 591-92, 304 S.E.2d 644, 658-59 (1983), *cert. denied*, 464 U.S. 1063 (1984).

■ Quesinberry and Hinkle were in the process of stealing money when they were interrupted by Haynes. Quesinberry left the room where he had found the money, chased Haynes, shot him, returned to the room, and retrieved the money. Quesinberry and Hinkle then left the premises.[3] We hold that the robbery and killing of the victim were interdependent objects of a common criminal design.

### B. Jury Instructions and Guilt Verdict

After the evidence was concluded, jury instructions were discussed, and some were retyped. Counsel reviewed the instructions and tendered them to the court. The court then instructed the jury. Counsel presented closing argument and the jury retired to deliberate.

■ The jury returned its verdict finding Quesinberry guilty. The trial court read the verdict and stated to the jury:

> You may go to lunch with the Sheriff. Again, and even more so because the case is still going on and there are other matters of such severity that you must consider, do not talk among yourselves; do not let anybody talk to you; do not let anybody approach you; do not respond to any comments; try to avoid what would be inadvertent communication from anyone of any source.

---

[3] The trial court properly instructed the jury that the phrase "in the commission of a robbery" means that the killing was so closely related to the robbery in time, place, and causal connection as to make it part of the same criminal enterprise and that the Commonwealth must prove beyond a reasonable doubt, among other things, that the killing of Haynes "occurred during the commission of a robbery while [Quesinberry] was armed with a deadly weapon."

The sheriff escorted the jury from the courtroom.

While the jury was at lunch, the trial court discovered that a "failure to testify" instruction had not been tendered to the court nor given to the jury. It turned out that such an instruction had been prepared by counsel for Quesinberry and apparently given inadvertently to the Commonwealth's Attorney along with the instructions that were retyped. In any event, it was not among those tendered to the court. There is no suggestion whatsoever that the instruction was purposefully concealed or removed by anyone.[4]

When the court reconvened, out of the presence of the jury, the court informed counsel for Quesinberry and the Commonwealth's Attorney as follows:

> For purposes of the record, during the recess while the jurors were still in the custody of the Sheriff and taken to lunch, it occurred to me that there was not presented for me to read to the jury a formal statement of law that advised the jury that they were not to consider the failure of the defendant to testify.
>
> Now, each member of the jury was told at the beginning of the case that the defendant may not testify, and if he did not testify the Fifth Amendment of the Constitution prevented the jury from considering that. His failure to testify could not be held against him in any way, and I asked each of them if they could follow that law, and they each said they would.
>
> I further told the members of the jury that I would give them a formal instruction on that point at the end of the trial, and thinking about the matter during lunch while the jury was out, I reflected that an instruction of that sort was not in the group of instructions that were read to the jury, and I think that ought to be done. I think that the alternatives may create a number of problems that should be addressed right now.

The jury returned to the courtroom and the court instructed the jury as follows:

---

[4] The instruction prepared by counsel for Quesinberry stated: "[T]he defendant does not have to testify. The exercise of that right cannot be considered by you."

Members of the jury, you recall perhaps at the beginning of the trial when I talked to all of you, I told you that there were some laws that may become applicable in the given trial. One of them is the presumption of innocence. I also told you that the defendant did not have to testify in the case; that was his right, that was a protection he has under the Constitution, and additionally that it was not evidence — that you could not consider in any way his failing to testify, and I asked each of you if you could . . . comply with that law, and you . . . told me that you could.

I also told you at the same time that if that occasion arose, meaning the defendant's failure to testify, the decision was to be made by his lawyers, and I would give you a formal statement of law at the end of the case.

While you were at lunch and I was at lunch, I was thinking about the case and matters that took place and . . . the procedures and safeguards . . . it occurred to me that you were not given at the end of the case a formal written instruction that told you what I told you orally at the beginning of the trial.

So what I think is proper and what I am going to do now is read you one additional instruction, and I am going to ask you to go back into your jury room, and in view of this additional instruction that I read to you, the failure of the defendant to testify instruction, and all the other instructions I have already given you that you have already considered, then I will ask you to come back and tell me what your verdict is.

The additional instruction of law is this: 'You are instructed that the defendant does not have to testify. The exercise of that right cannot be considered by you.'

I will give that to you formally and in writing and I will send you back with new verdict forms, and the same language and all the information. The matter is still before you, and I ask you in view of all the evidence as you perceive it and all the other instructions and this additional instruction, would you tell me by your written verdict form what your decision is in the case? All right. Go into your jury room, if you please.

The jury deliberated again and returned its written verdict forms which found Quesinberry guilty of all of the indicted offenses. Additionally, the trial court entered the following order:

> After the jury had reached their verdicts and while they remained in the presence of the Court and under its control, having not been discharged, the Court determined that an instruction regarding the defendant's failure to testify was not formally tendered or given. The Court further determined that such instruction was prepared by defense counsel and given to the Commonwealth's attorney with other proposed defense instructions. Whereupon the Court formally instructed the jury upon the defendant's right not to testify in his own behalf and remanded the jurors to the jury room to consider all the Court's instructions and to deliberate upon each charge.

Quesinberry contends that because Code § 19.2-264.3 creates a bifurcated proceeding in a capital murder trial, the jury was discharged from its responsibilities on the issue of guilt after its initial verdict had been returned and, therefore, the trial court should not have reinstructed the jury. We disagree.

■ We have consistently applied the rule, followed generally in most jurisdictions, that once a jury is discharged and leaves the presence of the court, it cannot be reassembled to correct a substantive defect in its verdict. *LeMelle* v. *Commonwealth*, 225 Va. 322, 324, 302 S.E.2d 38, 39 (1983). Here, however, the jury had neither been discharged nor left the presence of the court. The jury remained under the custody of the sheriff and within the control of the court. The sanctity of the jury was neither violated nor subjected to any hazard of suspicion. *See Melton* v. *Commonwealth*, 132 Va. 703, 111 S.E. 291 (1922). It was the trial court's responsibility to reinstruct the jury, and we hold that the court properly discharged that duty.

## C. Admission of Photographs

Quesinberry contends that the trial court erred because it admitted in evidence photographs of the victim identified as: Commonwealth's Exhibit 60 (two gunshot wounds to the victim's back); Commonwealth's Exhibits 61A and B (photographs of gunshot wounds to victim's back); Commonwealth's Exhibits 62A and

B (injuries to the victim's head); and Commonwealth's Exhibit 63 (a laceration to the victim's right ear). Quesinberry argues that the photographs are inflammatory, unduly prejudicial, and of little or no probative value. We disagree.

We have repeatedly held that the admission of photographs in evidence rests within the discretion of the trial court. *Spencer I*, 238 Va. at 290, 384 S.E.2d at 783. "Photographs of a victim are relevant if they tend to show motive, intent, method, premeditation, malice, or the degree of atrociousness of the crime." *Gray* v. *Commonwealth*, 233 Va. 313, 342-43, 356 S.E.2d 157, 173, *cert. denied*, 484 U.S. 873 (1987). We have reviewed the exhibits and we find no abuse of discretion by the trial court. The gunshot wounds shown in the photographs support the Commonwealth's theory that Quesinberry pursued the victim and shot him at a close range. The photographs of the head injuries indicate that Quesinberry hit the victim more than once with the pistol.

### D. The Jury's View of the Crime Scene

Quesinberry argues that the trial court erred because it permitted the jury to view the crime scene and allowed a police forensic investigator to identify certain rooms and areas in Tri-City Electric's building. We disagree.

A jury may view a crime scene upon the request of the Commonwealth or defendant "when it shall appear to the court that such view is necessary to a just decision." Code § 19.2-264.1. Whether such request should be granted lies within the discretion of the trial court. *Crockett* v. *Commonwealth*, 187 Va. 687, 701-02, 47 S.E.2d 377, 384 (1948). Here, the trial court observed:

I think that number one that a view, while it is an unusual request is proper. Number two, as a matter of law a view is part of the trial, so the defendant must be present. Number three, the Court has the authority and duty to insure the integrity of the process so that neither jurors or anybody else would become involved in extraneous matters . . . . [F]ourth, the view itself is not evidence. I rule that it is simply a procedure that would help the jury understand the oral testimony, the sworn testimony that they have heard in the courtroom.

The crimes occurred in a large building which contained a business area, offices, and a warehouse. A view was appropriate to allow the jury to understand the size and dimensions of the building and how these factors related to the crimes. Evidence adduced at trial demonstrated that the scene was substantially the same at the time of the view as it was when the crimes occurred. *See Culpepper* v. *Neff*, 204 Va. 800, 805-06, 134 S.E.2d 315, 319-20 (1964). Statements from the police investigator were appropriate because it was necessary to identify rooms and the business area for the jury to avoid confusion.

## VII. THE PENALTY PROCEEDING

### A. Admissibility of Evidence

During the penalty proceeding, Quesinberry objected to the admission of (i) evidence that a loaded .22-caliber rifle was found in the back seat of a car in which he was a passenger when he was arrested on a charge of robbery in August 1979; (ii) evidence that the pistol that Quesinberry used to kill the victim was stolen; (iii) evidence that Quesinberry used marijuana and cocaine; and (iv) admission of a photograph of the victim taken during an autopsy.

The trial court properly admitted the evidence. Code § 19.2-264.4(B) states, in part:

> [E]vidence may be presented as to any matter which the court deems relevant to sentence . . . .
> Evidence which may be admissible, subject to the rules of evidence governing admissibility, may include the circumstances surrounding the offense, the history and background of the defendant, and any other facts in mitigation of the offense.

We have repeatedly and consistently adhered to the principle that "a trier of fact called upon to decide whether . . . to impose the death sentence is entitled to know as much relevant information about the defendant as possible." *See Beaver* v. *Commonwealth*, 232 Va. 521, 529, 352 S.E.2d 342, 347, *cert. denied*, 483 U.S. 1033 (1987); *see also Peterson* v. *Commonwealth*, 225 Va. 289, 302 S.E.2d 520, *cert. denied*, 464 U.S. 865 (1983); *Quintana* v. *Commonwealth*, 224 Va. 127, 295 S.E.2d 643 (1982), *cert. denied*, 460 U.S. 1029 (1983).

 Evidence that a loaded .22-caliber rifle which was in plain view in the car in which Quesinberry was arrested and evidence that he purchased and possessed the stolen .45-caliber pistol which was used to kill the victim was admissible to show his propensity to arm himself with a weapon. His use of illegal drugs is relevant to the issue of "future dangerousness." The photograph of the victim's head taken during the autopsy is relevant because it demonstrated to the jury the force and impact of the blows caused by Quesinberry when he hit the decedent in the head with the pistol. The Commonwealth's witness explained to the jury that the skin shown on the picture had been removed by the medical examiner and not by Quesinberry's blows.

### B. Definitions

 After the jury had retired to deliberate and fix punishment, the jury returned and requested that the court define the following words which appeared in some of the jury instructions: culpable, moral turpitude, quantitatively, and qualitatively. The court, without objection from counsel, read the definitions to the jury. After the jury had returned to the jury room to continue its deliberations, Quesinberry then objected to the definitions given by the court. Quesinberry failed to preserve his objection because he did not object timely and his argument is procedurally barred. Rule 5:25. *See Cheng*, 240 Va. at 38-39, 393 S.E.2d at 605-06.

### VIII. SENTENCE REVIEW

Code § 17-110.1(C) requires us to consider and determine whether the death sentence was imposed under the influence of "passion, prejudice or any other arbitrary factor." We must also decide whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Id.*

Quesinberry argues that the trial court should not have imposed the death penalty because his conduct "does not rise to the level of an aggravated battery." He asserts that he went to Tri-City Electric for the express purpose of stealing money and did not know that the victim would be present. He further argues that the evidence is insufficient to support the jury's finding that his conduct was "outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the

victim." Code § 19.2-264.4(C). Finally, he argues that the evidence, even when viewed in the light most favorable to the Commonwealth, does not establish his "future dangerousness." We disagree.

When Quesinberry entered Tri-City Electric's premises, he was armed with a loaded .45-caliber semi-automatic pistol that he had taken with him for "security." While he and Hinkle were rummaging through the offices looking for money, they were interrupted by the victim. Quesinberry immediately ordered Hinkle to shoot Haynes. When Hinkle refused to do so, Quesinberry took the .45-caliber pistol from Hinkle and began to chase and shoot at his unarmed victim. While Quesinberry chased the victim, shooting at him, the victim pled, "God, help me." Quesinberry shot the victim twice in the back.

Either bullet wound would have been lethal. One bullet severed the victim's spinal cord, rendering him paralyzed in his legs. One wound was a contact wound which meant that Quesinberry chased the victim until he caught him, and then placed the pistol "up against [his] clothing" and pulled the trigger. After Quesinberry had shot the victim twice, he returned to the office and retrieved money and stamps. As Quesinberry was leaving the building, the victim, lying on the floor paralyzed, tried to push himself up. Quesinberry then hit the victim in the head with his pistol at least twice, with such force that he left a curved impression in the victim's skull. The victim died as a result of the gunshot wounds.

Quesinberry had a criminal history since age 18 which consisted of convictions for robbery, grand larceny, possession of stolen property, and breaking and entering. Additionally, he failed to comply with the rules of supervision while he was on parole and he absconded from probation. He had admitted to illegal drug use. Quesinberry had absconded from parole at the time he killed the victim. We find that there was sufficient evidence to support the jury's findings of "future dangerousness" and vile, horrible or inhuman conduct in that Quesinberry committed an aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder.

Pursuant to Code § 17-110.1(E), we have accumulated the records of all capital murder cases reviewed by this Court in which the death penalty was based upon the "future dangerousness" predicate, e.g., *Eaton*, 240 Va. 236, 397 S.E.2d 385; *Savino* v. *Commonwealth*, 239 Va. 534, 391 S.E.2d 276 (1990); *Fisher* v.

*Commonwealth*, 236 Va. 403, 374 S.E.2d 46 (1988), *cert. denied*, 490 U.S. 1028 (1989); *Pope*, 234 Va. 114, 360 S.E.2d 352; *Peterson*, 225 Va. 289, 302 S.E.2d 520; *Bassett* v. *Commonwealth*, 222 Va. 844, 284 S.E.2d 844 (1981), *cert. denied*, 456 U.S. 938 (1982); *Evans* v. *Commonwealth*, 222 Va. 766, 284 S.E.2d 816 (1981), *cert. denied*, 455 U.S. 1038 (1982), *aff'd on remand*, 228 Va. 468, 323 S.E.2d 114 (1984), *cert. denied*, 471 U.S. 1025 (1985); *Giarratano* v. *Commonwealth*, 220 Va. 1064, 266 S.E.2d 94 (1980); and *Stamper* v. *Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980), and the "vileness" predicate, *e.g.*, *Smith* v. *Commonwealth*, 239 Va. 243, 389 S.E.2d 871 (1990); *Watkins* v. *Commonwealth*, 229 Va. 469, 331 S.E.2d 422 (1985), *cert. denied*, 475 U.S. 1099 (1985), and we have also compiled those cases, where as here, the death sentences were based upon both aggravating factors of "future dangerousness" and "vileness." *See Spencer II*, 238 Va. at 319-20, 384 S.E.2d at 799-800 and *Smith*, 239 Va. at 269-70, 389 S.E.2d at 885-86.

Having reviewed those records, as well as cases in which life imprisonment was imposed, and having considered both the crimes and the defendant involved here, we conclude that Quesinberry's sentence of death was neither excessive nor disproportionate when compared to sentences generally imposed by other sentencing bodies in Virginia for comparable or similar crimes. Additionally, nothing in the record suggests that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factors.

## IX. CONCLUSION

We find no reversible error among the issues presented by Quesinberry's appeal. Having reviewed the sentence of death pursuant to Code § 17-110.1, we decline to set it aside. Accordingly, we will affirm the judgments in both cases.

Record No. 901257 - *Affirmed.*
Record No. 901258 - *Affirmed.*