COURT OF APPEALS OF VIRGINIA


Present: Judges Elder, Lemons and Senior Judge Cole
Argued at Richmond, Virginia


VALENTINA DJELEBOVA

MEMORANDUM OPINION[*] BY

v.    Record No. 1748-98-2    JUDGE DONALD W. LEMONS
                                MARCH 7, 2000
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
James M. Lumpkin, Judge Designate

John Kenneth Zwerling (Lisa Bondareff Kemler;
Zwerling & Kemler, P.C., on briefs), for
appellant.

Marla Graff Decker, Assistant Attorney
General (Mark L. Earley, Attorney General, on
brief), for appellee.


Valentina Djelebova appeals her conviction for accessory

after the fact to robbery. On appeal, she argues that the trial

court erred (1) by denying her motion to suppress evidence and

(2) by instructing the jury that criminal liability for the

offense of accessory after the fact may exist beyond the

principal felon's apprehension and arrest. Finding no

reversible error, we affirm.

I.  BACKGROUND

On September 26, 1998, Dorian Lester met with Albemarle

County Police Officer Rob Heide at the Albemarle County Police

_____

* Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

Department.  Lester was accompanied by a woman Officer Heide recognized as Lester's girlfriend.  She wore a wide brimmed hat, a black and yellow plaid mini-skirt and gloves.  Heide knew Lester from their previous work as bodyguards for a wealthy Albemarle family.  The family had recently received a telephone call from a car rental agency in New York City asking for Lester and indicating that he had rented a van that was overdue and needed to be returned.  Heide stated that Lester had been acting strangely, that he recently purchased a new 9 millimeter pistol, and that he claimed to have access to police ammunition.  Heide had also seen Lester with a box of Winchester +p+ ammunition within the previous two years.  According to Heide, Lester had traded antique swords with George Moody, a jewelry dealer in Charlottesville.  Heide stated further that on September 26th, Lester drove a dark blue or green minivan and that he believed Lester carried a weapon in a shoulder holster.

A number of police officers knew Lester and described him as a tall, thin man with dark, neatly groomed hair and a distinct nose.  They knew he was trained in the marital arts, had a concealed weapons permit and worked as a bodyguard.  A number of officers had recently seen Lester with Djelebova.  Djelebova was described in a manner consistent with the woman who accompanied Lester at the police station meeting with Heide.

On September 27, 1998, between three and five o'clock in the afternoon, a neighbor of George Moody observed a dark blue

-

minivan drive up and down the street five or six times. Although she did not see anyone exit the van, she saw a man and woman walk down the street to Moody's residence and knock on his front door. The man was Caucasian, tall, thin, in his forties with neatly groomed gray hair, wore a gray suit and had a pointed nose. The woman was Caucasian, approximately five feet tall and wore a yellow and black, plaid mini-skirt with black pantyhose and long black gloves.

Moody met with a customer around 5:30 that evening and showed her two emerald cut diamonds that he intended to sell to another customer in San Francisco, California. At approximately 6:00 p.m., an Albemarle County police officer observed a dark blue or green minivan parked several houses down from Moody's bearing North Carolina license plates with damage to the front passenger side. The vehicle was gone at 7:00 p.m. when the officer left the area.

At 6:35 p.m., Moody's fiancée telephoned him and became concerned when neither Moody nor his answering machine picked up her call. She drove to his house and, shortly after 8:00 p.m., found his body in his basement where he made, repaired and sold jewelry. Moody's safes were open, and a number of jewels and other stones were scattered around the area. Empty jewelry trays were found on his workbench and near his body on the floor. The emerald cut diamonds that Moody was to sell to a customer in California were missing. There were no signs of

-

forced entry.  Charlottesville police later found a single shell casing near the body that was consistent with a bullet fired from a Glock 9 millimeter, semi-automatic pistol.  The casing also indicated that the ammunition was +p+, a type normally used by police officers.  An autopsy later revealed that Moody died as a result of a single bullet wound to the head.

On the morning of October 1st, the police contacted Jamie Sacco, the owner of Snooky's pawnshop in Charlottesville and a known associate of Lester.  The police ascertained from Sacco that Lester had recently driven a dark colored minivan with damage to its front end, that Lester recently returned the van to the Richmond International Airport, and that Lester borrowed Sacco's car on September 29th so that he could obtain another rental vehicle.  According to Sacco, Lester also indicated that he had acquired police ammunition and had recently bought a Glock 9 millimeter, semi-automatic pistol that he kept on his person.  Sacco's wife told the police that Djelebova was known to carry a "Barett" pistol in her purse.  Sacco indicated that Lester had recently inquired where he could sell or trade diamonds and where he could purchase rubies.  The detective learned that Lester had arranged to meet with Sacco at the pawnshop at 10:30 a.m. on October 1st to redeem certain pawned items and to pick up a package.  Lester had indicated to Sacco that he was leaving the United States "for good" and going to England.

-

Between 6:00 a.m. and 7:00 a.m. on October 1st, police contacted personnel at the Richmond International Airport concerning the minivan that Lester had rented. It was confirmed that there was a minivan, described as dark purple, in the lot with visible damage to its front passenger side and bearing North Carolina license plates. National Car Rental company personnel confirmed that this was the minivan which had been rented to Lester in New York and had been returned to the airport facility on September 28th. Lester was also found to be booked on an October 1st, 7:15 p.m. flight from Dulles Airport to London.

Suspecting Lester and Djelebova in the murder and robbery of Moody, police assembled the information and began the paperwork necessary to obtain search warrants for Lester's person, the rental minivan and the residence in Fluvanna County where Lester was reported to have been living. Based on Lester's background in security and surveillance, the nature of the "execution" style murder, the knowledge that both Lester and Djelebova might be carrying weapons and information that the couple was leaving the United States for England that day, police decided to intercept Lester and Djelebova in the basement of the pawnshop during their planned meeting with Sacco. A SWAT team was assembled and was directed to neither question nor search the suspects other than a pat-down for weapons.

-

Around noon on October 1st, Lester and Djelebova entered the pawnshop basement. The SWAT team immediately detained them and placed them in handcuffs. Police conducted a pat-down search of Djelebova for weapons and found that she held a small purse containing a hard object that the officer believed to be a gun. The officer opened the purse and found a semi-automatic Baretta pistol. A pat-down search of Lester produced a Glock 9 millimeter pistol.

Lester and Djelebova were taken to the police station, and both were advised of their <u>Miranda</u> rights. They were held in separate interrogation rooms. Djelebova was informed that the police were conducting an investigation of a murder and a robbery. According to Djelebova's statement, she and Lester rented a car that was parked several blocks from the pawnshop. They were scheduled to depart from Dulles Airport that evening for England. She also said that Lester had given her some precious gems that were stored in one of her suitcases located in the vehicle.[1] At 4:05 p.m., Djelebova was served with an arrest warrant for carrying a concealed weapon.

Djelebova was tried on indictments charging her with first degree murder, robbery and use of a firearm.[2] During

---

[1] A search warrant was later obtained for the rental car. It was executed later that evening after the car was towed to the police station.

[2] Djelebova was initially charged in four separate indictments with the following offenses: (1) first degree

-

deliberations at trial, the jury sent a question to the court about the crime of accessory after the fact. The jurors inquired whether liability for that offense continues between the time of the commission of the offense and the arrest of the primary criminal agent, or between the commission of the offense and the trial of the primary criminal agent. Both defense counsel advised the court that criminal liability for the accessory begins "[a]fter the offense." The court instructed the jury that, "[t]he offense of accessory after the fact does cover the time period after the crime, period. After the crime."

The foreman asked the question again and was informed by the court that "accessory after the fact means accessory after the crime." A juror then asked if there were "no limits" to that, and the court responded again, "[i]t would be anytime after the crime." With no further questions, and no remarks from counsel, the jury returned to the jury room to deliberate.

After the jury returned to their deliberations, defense counsel asserted that an accessory's criminal liability exists

---

murder, in violation of Code § 18.2-32; (2) robbery, in violation of Code § 18.2-58; (3) use of a firearm during the commission of a felony, in violation of Code § 18.2-53.1; and (4) grand larceny. Prior to trial, the court granted Djelebova's motion to require the Commonwealth to elect whether to try her on the murder, robbery and use of a firearm indictments or on the grand larceny indictment. The Commonwealth elected to go to trial on the murder, robbery and use of a firearm indictments.

-

only until the primary perpetrator is arrested.  Djelebova was acquitted of first degree murder, robbery and use of a firearm during the commission of a felony, and was convicted of being an accessory after the fact to robbery.

## II.  MOTION TO SUPPRESS

When reviewing the trial court's denial of a defendant's motion to suppress evidence, "the burden is upon the defendant to show that the ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error." McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc) (citation omitted).  This Court, however, is "bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them" and due weight is given "to the inferences drawn from those facts by resident judges and local law enforcement officers."  McGee, 25 Va. App. at 198, 487 S.E.2d at 261 (citation omitted).

Specifically, Djelebova claims that she was arrested without probable cause and, consequently, any evidence obtained during her detention should have been suppressed.  We disagree and hold that police engaged in a proper investigatory stop based on information linking Djelebova to the murder and robbery of Moody, conducted a proper pat-down based on information that Djelebova was armed and dangerous and, as a result of that pat-down, acquired probable cause to detain and arrest Djelebova for carrying a concealed weapon.

-

A police officer may approach a person to investigate possible criminal activity even though there is no probable cause to arrest if the police officer can "point to specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968). A court examining an officer's "articulable reasons for stopping a person" looks to the objective reasonableness of the officer's behavior. Riley v. Commonwealth, 13 Va. App. 494, 497, 412 S.E.2d 724, 725 (1992); see Terry, 392 U.S. at 21-22. "'Ultimate questions of reasonable suspicion and probable cause to make a warrantless search' involve questions of both law and fact and are reviewed de novo on appeal." McGee, 25 Va. App. at 197-98, 487 S.E.2d at 261 (quoting Ornelas v. United States, 517 U.S. 690, 691 (1996)).

When the suspects were detained at Snooky's pawnshop, the police knew that Djelebova and Lester were companions. The day before the murder, the couple had been seen together at the Albemarle police station driving a vehicle consistent with the vehicle seen near Moody's house around the time of the murder. Furthermore, the couple that Moody's neighbor described knocking on Moody's door the evening of the murder matched Officer Heide's description of the clothing worn by the woman he recognized as Lester's girlfriend on September 26th and the description that was given of Lester by other police officers

-

who knew him.  Lester had dealt with the victim previously and was known to carry the same model weapon and specialized ammunition that was used in the murder.  Additionally, Lester was reportedly looking for somewhere to sell diamonds and, on October 1st at 7:15 p.m., was leaving from Dulles Airport "for good" to go to England with Djelebova.  Based upon all of the information available to them at the time of the seizure, we hold that the officers' decision to conduct an investigatory stop was reasonable.

Subsequent to the investigatory stop, both suspects were subjected to a "patdown" for weapons.  Based upon the information known by the police, Djelebova was traveling with Lester, was believed to be armed and was implicated along with Lester in the murder and robbery of Moody.  According to the police officer who conducted the pat-down of Djelebova, he felt a hard object that was "exactly what the shape of a small handgun would feel like."  It was located in the precise place where Sacco's wife said Djelebova carried her weapon.  Once the police officer felt what he believed to be a weapon during his pat-down of Djelebova, he was permitted to remove the weapon from the purse in which she carried it.  See Phillips v. Commonwealth, 17 Va. App. 27, 31, 434 S.E.2d 918, 920-21 (1993).  Considering all of the information known to police, it was reasonable for them to engage in a pat-down of Djelebova in the interest of safety.  See United States v. Hensley, 469 U.S. 221,

-

235 (1985); Servis v. Commonwealth, 6 Va. App. 507, 519, 371
S.E.2d 156, 162 (1988).

Following the pat-down search, police had probable cause to
arrest Djelebova for carrying a concealed weapon.  Police knew
that the stated reason for the visit to Snooky's pawnshop was
for Lester to redeem certain pawned items and to recover a
package.  Additionally, police knew that Djelebova and Lester
had airplane tickets to England that evening and had expressed
intentions not to return to the United States.

> [P]robable cause is a flexible, common-sense
> standard.  It merely requires that the facts
> available to the officer would "warrant a
> man of reasonable caution in the belief,"
> Carroll v. United States, 267 U.S. 132, 162
> (1925), that certain items may be contraband
> or stolen property or useful as evidence of
> a crime; it does not demand any showing that
> such a belief be correct or more likely true
> than false.  A "practical, nontechnical"
> probability that incriminating evidence is
> involved is all that is required.  Brinegar
> v. United States, 338 U.S. 160, 176 (1949).
> Moreover, [the Supreme Court of the United
> States'] observation in United States v.
> Cortez, 449 U.S. 411, 418 (1981), regarding
> "particularized suspicion," is equally
> applicable to the probable-cause
> requirement:
>
>> "The process does not deal with
>> hard certainties, but with
>> probabilities.  Long before the
>> law of probabilities was
>> articulated as such, practical
>> people formulated certain
>> common-sense conclusions about
>> human behavior; jurors as
>> factfinders are permitted to do
>> the same-and so are law
>> enforcement officers.  Finally,

-

> the evidence thus collected must
> be seen and weighed not in terms
> of library analysis by scholars,
> but as understood by those versed
> in the field of law enforcement."

Texas v. Brown, 460 U.S. 730, 742 (1983).

After voluntarily accompanying the police to the station to answer questions, Djelebova told police that she and Lester had parked a rental car several blocks from the pawnshop, and she confirmed that the couple was scheduled to depart from Dulles Airport that evening for England. Also, she told police that Lester had given her some precious gems that were stored in one of her suitcases located in the vehicle. She gave no indication of intent to sell a firearm nor to have one repaired.

Accordingly, we hold that the investigatory stop was based on reasonable, articulable suspicion that Djelebova was involved in the murder and robbery of Moody, that the pat-down was conducted in the interest of safety since Djelebova was known to be armed and possibly dangerous and, as a result of that pat-down, police acquired probable cause to detain and arrest Djelebova for the offense of carrying a concealed weapon.

The trial court did not err in denying Djelebova's motion to suppress evidence.

### III. THE JURY INSTRUCTION

Djelebova next contends that the trial court erred by failing to instruct the jury that liability for the offense of

-

accessory after the fact ends at the time the person suspected of committing the felony is arrested and charged.

After the jury retired to deliberate, it informed the court that it was having difficulty understanding the instruction on accessory after the fact. Specifically, the jury's question pondered the duration of the existence of criminal liability. When the trial court was advised that the jury had a question, it explained the question to counsel and gave counsel an opportunity to respond. Defense counsel told the court that criminal liability exists for an accessory "after the offense," and, "after the offense, not after the arrest." The trial court agreed. The jury was brought back into the courtroom and told by the trial court that accessory after the fact "does cover the period of time after the crime, period. After the crime."

The defense counsel was informed of the jury's question, participated in defining the answer, and sat silently while an answer virtually identical to the one he initially proposed to the trial court was given to the jury. Defense counsel did not object until after the jury left to deliberate further. Consequently, the objection came too late. See Quesinberry v. Commonwealth, 241 Va. 364, 380, 402 S.E.2d 218, 228 (1991) (objection to trial court's response to jury question made after the jury returns to the jury room to deliberate came too late and barred consideration of the issue on appeal); Newton v. Commonwealth, 29 Va. App. 433, 459-60, 512 S.E.2d 846, 858-59

-

(1999) (objection to trial court's response to jury question coming after jury retired to deliberate was barred). The matter has not been preserved for appeal, and we are barred from its consideration. See Rule 5A:18.

## IV.  CONCLUSION

Finding no reversible error, Djelebova's conviction is affirmed.

Affirmed.