COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present: Judges Beales, O'Brien and Raphael
Argued at Lexington, Virginia


BRIAN EDWARD SHEETS

OPINION BY
v.     Record No. 0081-23-3          JUDGE RANDOLPH A. BEALES
MAY 7, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF WASHINGTON COUNTY
C. Randall Lowe, Judge

John S. Koehler (R. Wayne Austin; The Law Office of James Steele,
PLLC; Scyphers & Austin, on briefs), for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, Brian Edward Sheets was found guilty and convicted of rape in

violation of Code § 18.2-61.  On appeal, Sheets argues that the evidence was insufficient to

convict him, that the trial court did not properly instruct the jury, and that the trial court did not

properly consider the report about Sheets's "mental health as a mitigating factor for sentencing"

him.

I.  BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Scott v.

Commonwealth*, 292 Va. 380, 381 (2016).  In doing so, we must "discard the evidence of the

accused in conflict with that of the Commonwealth, and regard as true all the credible evidence

favorable to the Commonwealth and all fair inferences to be drawn therefrom."  *Parks v.

Commonwealth*, 221 Va. 492, 498 (1980) (internal quotation marks omitted).

Brian Sheets ("Sheets") and K.S.[1] married in 2013. At trial, K.S. testified that on October 31, 2018, she made a plan with Sheets to have dinner, watch scary movies on television, and then "maybe have sex that night" because Halloween was her favorite holiday. K.S. went to a grocery store to get ingredients to make chili while Sheets stayed at home and spoke with a neighbor outside their house. K.S. testified that she returned home and finished making chili. About ten o'clock that night, as K.S. testified, "He [Sheets] came in and we started to have sex." She recalled, "At the beginning it was consensual and for about I'd say half an hour, give or take." K.S. then testified that, after a while, "I told him I wanted to stop. That I was hurting and I was tired. And I didn't want to do this anymore." K.S. testified that Sheets "was on top of me," and she recounted that he told her that "you got yours, it's only fair that I get mine . . . ." K.S. testified that she "kept telling him to stop," but that Sheets refused and that he told her to change positions to "doggy style." She then stated, "I at that point was just so much in shock and terrified that I just did what I was told" even though she had already told him that it hurt as his penis was penetrating her vagina. She testified that, in total, "I said 'stop' probably about twenty-some times." K.S. also stated:

> I remember at one point I was told to turn back over on my back
> and I just looked out the window at that time, and I kind of
> checked out. The next thing I remember is saying, I feel like
> you're forcing me to do this because you are, and that's when he
> stopped.

K.S. testified that the encounter "ended at eleven-thirty." When asked how long Sheets continued the sexual intercourse after she told him to stop, K.S. answered, "Forty-five minutes."

Counsel for the Commonwealth asked K.S. why she did nothing to try to physically stop Sheets besides telling and begging Sheets to stop. K.S. answered, "I was scared." K.S. also explained, "I was terrified of what could happen. I was naked underneath him and he has a

---

[1] We use initials, instead of the victim's name, in an attempt to better protect her privacy.

history of really erratic behavior. I didn't want to make it worse for myself. I didn't know what would happen." She described that Sheets "would fly into these fits of rages and I would leave the house and go to my mom's, which would make it worse."

According to K.S.'s testimony, one such episode of Sheets's erratic behavior occurred just two days earlier on October 29, 2018. While at home that day, K.S. testified that Sheets "started raging on me" and "screaming at me." K.S. stated that she "called my mom and kept her on the phone with me so that I could have a reason to be allowed to leave safely without him trying to stop me or prevent me like he had in the past." K.S. described that Sheets followed her to her mother's house, where he screamed at her again and "started moving backward and forward toward me and had drawn his fist back like he was going to hit me." K.S. testified that when Sheets drew his fist back, "My mom got scared. She saw it and stood between us." Later that night, Sheets left his mother-in-law's house.

K.S. also later fled the marital home on November 8, 2018, after Sheets became angry with her that day. K.S. testified that she did not immediately report to the police what Sheets had done to her on October 31, 2018, because she was "scared, ashamed," and "I was just terrified and shocked and just numb." K.S. eventually reported the sexual assault to law enforcement in June 2019 and later pursued criminal charges against Sheets.

On cross-examination, counsel for Sheets asked K.S. why she did not simply leave the bedroom that night if she no longer consented to the sexual intercourse. K.S. responded:

> Because there was a very violent man standing above me and I'm
> naked, and had just two days prior almost and physically hurt my
> hand, and I had no clue what was about to happen. I had been
> begging him to stop and he wouldn't. And I had no idea what
> would happen to me if I just jumped out of bed. That would have
> been the ultimate rejection to him.

K.S.'s mother also testified. She confirmed that Sheets angrily confronted K.S. at the mother's house on October 29, 2018. In fact, K.S.'s mother testified, "I got scared that he was going to hit

- 3 -

her," and so she stated that she stepped in between Sheets and K.S. and asked him to leave her house.

After the close of evidence, the trial court orally read all the jury instructions to the jury, including the following intimidation instruction labeled as Instruction 19:

> The Court instructs the jury that intimidation requires putting a victim in fear of bodily harm by exercising such domination and control of her as to overcome her mind and forebear her will.

After the trial court read to the jury all the instructions, a recess was taken beginning at 2:45 p.m. for the jury to deliberate. At 3:12 p.m., the trial court came back on the record, at which time the trial court told both counsel that the jury "request[s] the Court's explanation, definition of intimidation." Without objection from either counsel, the trial judge wrote down a message to the jury that read, "You must rely on the Jury instructions as given by the Court." At 3:41 p.m., the trial court again came back on the record and explained that the jury did not have Instruction 19 (the intimidation instruction), that the jury was "directed to stop deliberating until we made sure that they had all" the instructions, and that the court had conferred with counsel and had then given each juror a copy of Instruction 19 and a new packet of all the jury instructions. The trial court then asked both counsel on the record, "Is there any other action either side wishes me to take in this matter?" Both counsel answered, "No, sir."

The jury finished deliberating at 4:29 p.m. and returned a verdict finding Sheets guilty of rape. Sheets did not make any motion or objection at that time. Sheets later filed a motion to set aside the verdict and also a "Motion for a New Trial," "on the grounds that the jury was not properly instructed initially and that it was impossible thereafter to cure this deficiency." The trial court denied the motions.

Before sentencing, Dr. Colin Barrom, a licensed clinical psychologist, evaluated Sheets and filed a report to the trial court pursuant to Code § 19.2-300.[2]  In the report, Dr. Barrom found that Sheets fell into the "Below Average Risk category [which] indicates his score is most similar to offenders who have a below average risk for being charged or convicted of another sexual offense."  In addition, Dr. Barrom found that K.S. "obtained a permanent protective order against the accused [Sheets]" after the two separated – and that Sheets violated this order by calling K.S. on July 3, 2019.  In his report, Dr. Barrom also stated, "From his history there appears to be a low risk of serious physical harm to others by Mr. Sheets."  A presentence investigation report of Sheets's prior criminal conduct was also prepared in this case.  That presentence report showed that Sheets was found guilty of two protective order violations that occurred after October 31, 2018.

At the sentencing hearing, the trial court stated that it had considered the unique facts of this case, the victim impact statement, and the Code § 19.2-300 report that it had asked to be prepared prior to sentencing. The trial court further recounted that it had reviewed Sheets's criminal record and observed that Sheets had been convicted for two protective order violations against K.S. months after the rape of her.  The trial court then explained, "So I continued to have concern for this victim."  The trial court sentenced Sheets to 75 years of incarceration for rape with 65 years suspended, leaving an active sentence of 10 years for Sheets to serve.  Sheets now appeals to this Court.

_____

[2] Dr. Barrom's report and other portions of the record in this case have been sealed.  Nevertheless, this appeal necessitates unsealing limited portions of the record, including Dr. Barrom's findings, to resolve the issues Sheets has raised.  Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case.  The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

II. ANALYSIS

A. Sufficiency of the Evidence

On appeal to this Court, Sheets does not contest that he engaged in sexual intercourse with K.S. on October 31, 2018. What he argues is that "the evidence failed to establish as a matter of law that the wife effectively conveyed her withdrawal of consent to sexual intercourse, thus negating the necessary *mens rea* on the part of the husband to commit rape."

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). In addition, "[a] rape conviction may be sustained solely upon the testimony of the victim. There is no requirement of corroboration." *Fisher v. Commonwealth*, 228 Va. 296, 299 (1984); *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005).

The Supreme Court has stated, "The elements of rape . . . consist of engaging in sexual intercourse with the victim, against her will, by force, threat, or intimidation." *Commonwealth v. Minor*, 267 Va. 166, 173 (2004) (alteration in original) (citing *Clifton v. Commonwealth*, 22 Va. App. 178, 184 (1996)); *see* Code § 18.2-61(A). Furthermore, "[a]lthough proof of rape requires proof of intent, *the required intent is established upon proof that the accused knowingly and intentionally committed the acts constituting the elements of rape*." *Minor*, 267 Va. at 173. This Court has explained, "Intimidation may be caused by the imposition of psychological pressure on one who, under the circumstances, is vulnerable and susceptible to such pressure." *Sabol v. Commonwealth*, 37 Va. App. 9, 18 (2001) (citation omitted).

In this case, K.S. gave a detailed account of the events of October 31, 2018. She testified that while she and Sheets were engaging in consensual sexual relations, she told him that she became tired, that the sexual intercourse began to hurt her, and that she wanted him to stop. K.S.

further testified that, despite her repeated pleas to Sheets to stop, Sheets continued to engage in sexual intercourse for about 45 minutes and even instructed her to move and change her position during that time. K.S. also testified that she was vulnerable because Sheets was on top of her while she was naked and that she was terrified of what he would do to her if she did not comply. In addition, testimony from K.S. and her mother both demonstrated that Sheets had a history of angry and erratic outbursts.

The totality of the evidence here supports the jury's implicit findings that Sheets intentionally engaged in actions that imposed psychological pressure on a vulnerable victim, K.S., and that put her in fear of bodily harm. *See Sabol*, 37 Va. App. at 18; *Minor*, 267 Va. at 173. Furthermore, the evidence shows that Sheets intentionally continued the sexual intercourse despite K.S.'s repeated pleas for Sheets to stop. Consequently, a rational factfinder could conclude that there was sufficient evidence that Sheets had the necessary *mens rea* to commit rape, and, therefore, to find him guilty of rape.

### B. The Trial Court's Instructions to the Jury

Sheets also contends that the trial court "erred in failing to set aside the jury's verdict where the jury deliberated for 20 minutes before it was discovered that the court had not provided the jury with defense instruction 19." Sheets argues that the court's response to "the delay in providing the jury with a copy of instruction 19" constitutes a "structural error that renders Sheets' trial fundamentally unfair." A structural error is "a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" *Morrisette v. Warden of the Sussex I State Prison*, 270 Va. 188, 192 (2005) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). The Supreme Court has explained that examples of structural errors include "improper instruction to a jury as to reasonable doubt and the burden of proof." *Id.*

In this case, Sheets does not argue that Instruction 19 was improper. Rather, his argument rests on the premise that a copy of what he describes as "defense instruction 19" was not provided to the jury early enough in their deliberations. Instruction 19 addressed how the Commonwealth would have to prove intimidation. Details about this point are not as fundamental to the framework of a fair trial as instructions about the burden of proof and reasonable doubt. If the jury were improperly told that the defendant bore the burden of proof, then that error would, in fact, taint the entire framework of the trial and the jury's ultimate verdict. *See id.*; *Green v. Young*, 264 Va. 604, 611-12 (2002) (holding that an error in a jury instruction was structural error when that instruction stated, "*If you find that the Commonwealth has failed to prove beyond a reasonable doubt each of the above elements of the offense as charged, then you shall find the defendant guilty.*"). Here, however, (1) given that the trial court orally gave Instruction 19 before the jury began deliberating, and (2) given that the trial court provided each juror a copy of Instruction 19 early in its deliberations (and before the jury had reached any verdict), the facts here do not at all resemble a "defect affecting the framework within which the trial proceeds." *Morrisette*, 270 Va. at 192. Consequently, the trial court's delay in providing the jury a copy of Instruction 19 – an instruction it had already given the jury orally – was simply *not* a structural error.

Sheets further contends that the trial court erred by not issuing new guidance to the jury after it provided each juror a paper copy of Instruction 19. On brief to this Court, Sheets argues, "The jury was not instructed to restart its deliberations or to reconsider what had already been discussed now that it had the proper instruction on what would constitute intimidation." According to Sheets, such reinstruction of the jury was required under *Quesinberry v. Commonwealth*, 241 Va. 364, 375 (1991). However, the facts in *Quesinberry* were quite different than those here, and they demonstrate why that case does not support Sheets's

arguments. *Id.* In *Quesinberry*, the jury returned a guilty verdict in the defendant's trial on charges of capital murder, robbery, and other crimes. *Id.* at 374. Immediately after the jury returned its verdict, the trial court released the jury to go to lunch with security from the sheriff's office. *Id.* at 375. The trial court then discovered that it had failed to give the "failure to testify" instruction. *Id.* After informing counsel, the trial court called the jury in after lunch, explained that it had failed to give the "failure to testify" instruction, then gave the jury that instruction along with new verdict forms, and asked the jury to view all the evidence along with its instructions and return a new verdict. *Id.* at 376. The jury then deliberated and again returned a verdict of guilty on all the charged offenses. *Id.* at 367, 377. The Supreme Court held that the trial court in *Quesinberry* did not err in how it handled the jury instructions. *Id.* at 377. The Court explained, "The sanctity of the jury was neither violated nor subjected to any hazard of suspicion." *Id.*

Although the facts in *Quesinberry* were actually more problematic for the Commonwealth than those present in the case now before us, the Supreme Court still did not find error or "any hazard of suspicion" in that trial court's proceedings. *Id.* at 374-77. In fact, unlike in *Quesinberry* (and as stated *supra*), the trial court here read Jury Instruction 19 to the jury before the jury began its deliberations, and after a relatively short delay, the trial court provided each juror a paper copy of that instruction before the jury ever reached a verdict. *See id.* For all these reasons, the trial court did not commit reversible error in instructing the jury in this case.

### C. The Trial Court's Consideration of the Code § 19.2-300 Report

In support of his final assignment of error, Sheets argues that the trial court erred "in Determining that Sheets was a Potential Repeat Offender with Respect to KES" and that the trial court "Failed to Give Proper Weight to the Code § 19.2-300 Report." Dr. Barrom's report pursuant to Code § 19.2-300 made multiple findings, including that Sheets falls in a "Below

Average Risk category" for the risk of committing a future sexual offense.[3] The evidence in the record shows that the trial court considered Dr. Barrom's report and that the trial court was still concerned that Sheets may reoffend – including the fact that, after the rape on October 31, 2018, Sheets had "two convictions for protective order violations against this victim." As the Supreme Court has stated, trial courts are "not required to give controlling effect to the mitigating evidence." *Reid v. Commonwealth*, 256 Va. 561, 569 (1998). Indeed, this Court has also previously emphasized, "Barring clear evidence to the contrary, [an appellate court] will not presume that a trial court purposefully ignored mitigating factors in blind pursuit of a harsh sentence." *Bassett v. Commonwealth*, 13 Va. App. 580, 584 (1992).

Furthermore, as the Supreme Court has also held, "Criminal sentencing decisions . . . are vested in the sound discretion of trial judges, not appellate judges." *Ming Duy Du v. Commonwealth*, 292 Va. 555, 563 (2016). "When exercising its discretionary power . . . , the trial court 'has a range of choice, and its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Id.* at 563-64 (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212-13 (2013)). "Given this deferential standard of review, we will not interfere with the sentence so long as it was within the range set by the legislature for the particular crime of which the defendant was convicted." *Fazili v. Commonwealth*, 71 Va. App. 239, 248 (2019) (internal quotation omitted).

A rape offense under Code § 18.2-61 "shall be punishable, in the discretion of the court or jury, by confinement in a state correctional facility for life or for any term not less than five years." Code § 18.2-61(B). The trial court here sentenced Sheets to 75 years of incarceration (with 65 years suspended), which is authorized under the statute. Furthermore, the evidence in the

---

[3] In certain criminal cases involving sexual offenses, Code § 19.2-300 provides that a trial judge may defer sentencing until a "report of a mental examination" of the defendant can be secured "to guide the judge in determining what disposition shall be made of the defendant."

record shows that the trial court considered the facts of this case, including Dr. Barrom's report, before sentencing Sheets. In short, we cannot say that the trial court abused its discretion in reaching this sentence. *See Minh Duy Du*, 292 Va. at 563.

### III. CONCLUSION

For all of the foregoing reasons, we do not disturb the judgment of the trial court convicting Sheets for rape under Code § 18.2-61.

*Affirmed.*