PRESENT: Kinser, C.J., Lemons, Goodwyn, Millette, McClanahan, and Powell, JJ., and Lacy, S.J.

ALFREDO ROLANDO PRIETO

OPINION BY
v.  Record No. 110632        JUSTICE LEROY F. MILLETTE, JR.
                              January 13, 2012
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Randy I. Bellows, Judge

In this appeal of right, we review two death sentences imposed upon Alfredo Rolando Prieto.  On September 18, 2009, we upheld two capital murder convictions against Prieto arising from the deaths of Rachael Raver and Warren Fulton III, as well as convictions for rape, grand larceny, and two counts of felonious use of a firearm.  We remanded for resentencing based on a finding of error in the penalty phase of the trial.  On November 5, 2010, following a new penalty phase, a jury unanimously found both aggravating factors of future dangerousness and vileness, either of which provides sufficient grounds for the imposition of the death penalty in the Commonwealth under Code § 19.2-264.2, and again recommended two death sentences.  On December 16, 2010, the circuit court entered a final order imposing the death penalty.  For the reasons that follow, we find no error in the circuit court's judgment and thus will affirm.

1

I.  BACKGROUND

A Fairfax County grand jury indicted Prieto in 2005 in connection with the deaths of Raver and Fulton.  Prieto was charged with two counts of capital murder, one count of rape, two counts of use of a firearm in the commission of a felony, and one count of grand larceny.  The factual and procedural history of the case until the time of the prior appeal was thoroughly recounted in our earlier review and is incorporated herein.  Prieto v. Commonwealth, 278 Va. 366, 682 S.E.2d 910 (2009) [hereinafter, Prieto I].[1]  While upholding the convictions in the guilt phase, we found the verdict forms defective in that they failed to make clear that the jury must be unanimous in finding vileness or future dangerousness or both aggravating factors in order to impose a sentence of death.  The forms also failed to include an explicit life-without-parole option even if the jury found one or both of those aggravating factors.  Accordingly, we remanded for resentencing.  Id. at 418, 682 S.E.2d at 938.

During the resentencing proceeding, the Commonwealth presented victim impact testimony from the family members of the deceased, as well as testimony regarding a prior adjudicated

_____

[1] In the first reported decision, we designated the two separate trials conducted by the circuit court, the first of which resulted in a mistrial as recounted in the initial appeal, as Prieto I and Prieto II.  We now refer to the first reported decision as Prieto I and designate this appeal as Prieto II.

2

rape and murder by Prieto in California and another alleged but unadjudicated rape and murder by him in Virginia. The jury also heard mitigating evidence presented by Prieto, including testimony as to the conditions of his traumatic upbringing during a civil war in El Salvador and his exposure to gang violence as a teenager in California. Because the evidence presented during the resentencing proceeding was extensive, we will specifically recount only those portions relevant to preserved assignments of error as addressed in the Discussion, infra.

After the presentation of aggravating and mitigating evidence, the jury unanimously found both aggravating factors of future dangerousness and vileness and recommended two death sentences. The trial judge declined to set aside the jury verdict and imposed the death penalty, which was subsequently stayed for these proceedings.

Prieto now appeals to this Court with 195 assignments of error. We will first dispose of those issues that were previously addressed by the Court in Prieto I, were not properly preserved at trial, or lacked accompanying argument as required by this Court. We then discuss more thoroughly the properly preserved issues: (1) whether Judge Randy I. Bellows erred in refusing to recuse himself; (2) whether the circuit court erred in allowing impermissible victim impact statements; (3) whether

3

the circuit court erred in not excluding evidence of various unadjudicated acts; (4) whether the circuit court erred in its verdict forms and jury instructions pertaining to aggravating and mitigating evidence and impermissibly limited mitigating testimony; (5) whether the circuit court erred in denying Prieto's motion to bar Dr. Stanton E. Samenow as the Commonwealth's mental health expert; (6) whether the circuit court violated Prieto's right against self-incrimination in permitting Dr. Samenow to inquire about the charged offenses and other convictions in his evaluation, permitting him to report that Prieto failed to cooperate, and permitting the Commonwealth to state in closing that Prieto never expressed remorse; (7) whether the circuit court erred in denying Prieto's motion for a jury view of the state prison; (8) whether the circuit court erred in denying Prieto's motions to strike Virginia's vileness aggravating factor and declare it so arbitrary and unclear so as to be unconstitutional; and (9) whether the circuit court erred in denying Prieto's request for access to grand jury and petit jury information and his motion to strike the jury pool. Finally, we conduct the statutorily mandated review as to whether the death sentences were imposed under the influence of passion, prejudice, and other arbitrary factors, or are excessive or disproportionate.

4

## II.  DISCUSSION

### A.  <u>Assignments of Error Waived</u>

In accordance with Rule 5:22(c), Prieto listed 195 assignments of error.[2]  On brief, Prieto only raised and argued a portion of them.  Prieto failed to provide arguments for assignments of error 1, 2, 10, 13, 15, 16, 17, 20, 21, 22, 23, 25, 27, 31, 32, 33, 39, 41, 42, 43, 45, 46, 47, 48, 49, 50, 51, 52, 53, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 80, 92, 97, 98, 99, 100, 108, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 122, 125, 126, 128, 129, 134, 135, 136, 137, 138, 140, 141, 142, 143, 144, 145, 146, 147, 148, 150, 154, 155, 156, 157, 161, 162, 163, 165, 167, 168, 169, 170, 181, 183, 184, 187, 188, 189, 190, and 194. Therefore, those assignments of error have been waived and will not be considered in this opinion.  Rule 5:27(d); <u>Andrews v. Commonwealth</u>, 280 Va. 231, 252, 699 S.E.2d 237, 249 (2010) ("Lack of an adequate argument on brief in support of an assignment of error constitutes a waiver of that issue."), <u>cert. denied</u>, ___ U.S. ___, 131 S.Ct. 2999 (2011); <u>Prieto I</u>, 278 Va. at 381, 682 S.E.2d at 917.

In his brief, Prieto lists assignments of error that he contends are addressed in some of his arguments.  A review of

_____

[2] The assignments of error are designated by the number Prieto has given them.

5

those arguments, however, demonstrates that they do not address the assignments of error Prieto claims they do.  As a result, assignments of error 5, 6, 7, 8, 9, 11, 38, 54, 87, 106, 109, 123, 124, 132, 133, 153, and 179 have been waived because of Prieto's failure to properly brief them.  Rule 5:27(d); Andrews, 280 Va. at 252, 699 S.E.2d at 249; Prieto I, 278 Va. at 381, 682 S.E.2d at 917.

Prieto addresses assignments of error 86 and 95 in footnote 5 on page 25 of his brief by merely stating the facts from the sentencing hearing upon which the assignments of error are based.  Prieto provides no argument in support of either assignment of error.  Thus, they have also been waived.  Rule 5:27(d); Andrews, 280 Va. at 252, 699 S.E.2d at 249.

For assignments of error 36 and 193, Prieto's argument merely reiterates the assignments of error themselves.  We have previously held that such reiteration is not a sufficient argument and will not support the assignment of error.  Teleguz v. Commonwealth, 273 Va. 458, 473, 643 S.E.2d 708, 718 (2007), cert. denied, 552 U.S. 1191 (2008).  Because Prieto has failed to argue these assignments of error, they are considered waived.  Rule 5:27(d); Andrews, 280 Va. at 252, 699 S.E.2d at 249; Prieto I, 278 Va. at 382, 682 S.E.2d at 917.

6

## B. Assignments of Error Defaulted

In assignment of error 14, Prieto contends that Virginia statutes regarding victim impact testimony are unconstitutional as applied because "[they] require[] trial courts to allow statutory victims to testify," which takes away the discretion of trial courts to weigh the probative and prejudicial value of such testimony. Prieto also argues that the statutes and the decisions of this Court have permitted trial courts to allow testimony that goes beyond just a glimpse of the victim's life or the loss to the family of the victim, instead allowing testimony that is prejudicial and cumulative.

In the argument accompanying assignments of error 81, 82, and 90, Prieto argues that his constitutional rights to a fair trial under the Sixth, Eighth, and Fourteenth Amendments were violated by the introduction of unnecessarily cumulative and inflammatory victim impact testimony leading to a fundamentally unfair sentencing proceeding and the risk that the death sentences were imposed in an arbitrary and capricious manner.

In assignments of error 85 and 139, Prieto contends that the circuit court erred in allowing the prosecutor to make improper arguments based on facts not in evidence and that the court further erred by not instructing the Commonwealth to refrain from arguing facts not in evidence.

In assignments of error 93, 101, 185, and 186, Prieto contends that the circuit court erred in admitting photographs of victims of a prior crime. The only argument Prieto presents, which can be found in footnote 6 on page 25 of his brief, is that the photograph in question should have been excluded "on materiality grounds and under Va. Code Ann. § 19.2-264.4 as interpreted by this Court in Andrews."

In assignments of error 130 and 131, Prieto argues that his rights were violated by statements made by the Commonwealth during closing arguments that it was speaking for the victims in asking for the death penalty. Prieto contends that these statements lead to a fundamentally unfair sentencing proceeding and the risk that the death sentences were imposed by the jury in an arbitrary and capricious manner.

In assignment of error 172, Prieto argues that the circuit court erred in permitting Richard Barna, Juanita Anders, Anthony Anders, Elizabeth Raver, Matthew Raver, Veronica Raver, and Dr. John Fulton to testify about the effects the murders had on other family members because Code §§ 19.2-264.4(A1) and -299.1 only allow for victim impact testimony to be about the effect of the crime on the person testifying.

A review of the record demonstrates that Prieto never raised any of the above arguments at the resentencing proceeding. Thus, they are all procedurally defaulted and will

8

not be considered on appeal. Rule 5:25; Prieto I, 278 Va. at 382, 682 S.E.2d 917-18; Teleguz, 273 Va. at 470, 643 S.E.2d at 716.

### C. Issues Previously Decided

Prieto assigns error to a number of issues that have previously been decided and rejected by this Court. As there is no reason to revisit these issues, we reject the following arguments based on our prior rulings.

#### 1. Indictment and Aggravating Factors

In assignment of error 4, Prieto argues that, had the grand jury intended to indict him for a crime for which he would be subject to the death penalty, then it needed to include the aggravating factors in the two capital indictments. By failing to do so, he contends, the most that he should have been sentenced to was life imprisonment. We have previously considered and rejected this argument. Jackson v. Warden, 271 Va. 434, 450, 627 S.E.2d 776, 790 (2006) ("There is no constitutional requirement that a capital murder indictment include allegations concerning aggravating factors."), cert. denied, 549 U.S. 1122 (2007); Muhammad v. Commonwealth, 269 Va. 451, 494, 619 S.E.2d 16, 40 (2005) ("We hold that aggravating factors are not constitutionally required to be recited in a capital murder indictment."), cert. denied, 547 U.S. 1136 (2006).

## 2. Constitutionality of Virginia's Death Penalty Statutes

In assignment of error 12, Prieto argues that Virginia's death penalty statutes are unconstitutional because:

(a) The death penalty statutes fail to adequately direct the jury regarding how to evaluate the aggravating factors of vileness or future dangerousness or mitigating factors so as to prevent the arbitrary and capricious imposition of the death penalty.
(b) Unadjudicated criminal acts can be considered for the finding of future dangerousness.
(c) Hearsay in the post-sentence report can be considered.
(d) The sentence of death is unable to be set aside upon a showing of good cause.
(e) The proportionality and the passion/prejudice review conducted by this Court are not consistent with the Eighth Amendment and other federal or state constitutional provisions.

We rejected these same arguments in numerous prior opinions as set forth in our decision addressing Prieto's previous appeal and, therefore, will not review them again. Prieto I, 278 Va. at 415-16, 682 S.E.2d at 937.

## 3. Reference to General Public for Future Dangerousness

In assignment of error 34, Prieto argues that the circuit court erred when it permitted the Commonwealth to refer to his future dangerousness to the general public when the only "society" he would ever be a part of if convicted would be prison society. We have previously rejected the argument that the only society that the jury should consider is prison society. Schmitt v. Commonwealth, 262 Va. 127, 149-50, 547 S.E.2d 186, 201-02 (2001) (citing Lovitt v. Commonwealth, 260

10

Va. 497, 516-17, 537 S.E.2d 866, 878-79 (2000), cert. denied, 534 U.S. 815 (2001)), cert. denied, 534 U.S. 1094 (2002).

### 4. Prieto's California Death Sentence

In assignments of error 35 and 105, Prieto argues that the circuit court erred in admitting two certified copies of his capital convictions from California because they showed he had been sentenced to death. Prieto contends that admitting this evidence violated his rights under the Eighth and Fourteenth Amendments because it undercuts the responsibility the jury should feel in sentencing a person to another death sentence. We already addressed this issue in Prieto's first appeal and found that there was no error in the admission of such evidence. Prieto I, 278 Va. at 413-15, 682 S.E.2d at 936.

### D. Recusal of Judge Bellows

On January 29, 2010, Prieto filed a motion for recusal of Judge Bellows on the grounds that Judge Bellows "presided over all stages of the [second of the two trials encompassed by Prieto I], which resulted in a capital murder conviction and death sentence" and his "involvement in – and statements made during – that trial and sentencing create a reasonable appearance of bias against the defendant." Judge Bellows denied this motion. Prieto alleges that this denial was in error.

Under Canon 3E(1) of the Canons of Judicial Conduct, "A judge shall disqualify himself or herself in a proceeding in

11

which the judge's impartiality might reasonably be questioned, including but not limited to instances where . . . [t]he judge has a personal bias or prejudice concerning a party."  We have stated that "in making the recusal decision, the judge must be guided not only by the true state of his impartiality, but also by the public perception of his fairness, in order that public confidence in the integrity of the judiciary may be maintained." Wilson v. Commonwealth, 272 Va. 19, 28, 630 S.E.2d 326, 331 (2006) (internal quotation marks and citation omitted).  The burden of proving a judge's bias or prejudice lies with the party seeking recusal.  Commonwealth v. Jackson, 267 Va. 226, 229, 590 S.E.2d 518, 519-20 (2004).  We employ an abuse-of-discretion standard to review recusal decisions.  Wilson, 272 Va. at 28, 630 S.E.2d at 331.

Prieto alleges that Judge Bellows' statements and demeanor at the previous sentencing provide a reasonable appearance of bias.  Specifically, he states that Judge Bellows was overly emotional in explaining his reasoning for entering the death sentences in Prieto's prior sentencing, at times "appear[ing] to become so over-wrought that he was forced to pause and regain composure before continuing."  Prieto quotes Judge Bellows' "highly emotional description of the victims and the crime":

> On the night you murdered — you executed these children and that is what they were, children.  They were just coming out of college with the brightest of

> prospects.  They are in love with each [other] and
> with their lives.  They had barely begun to experience
> and enjoy the pleasures and satisfactions of life.
>
> On the night you executed them, you turned the
> final moments of their lives on this earth into what
> can only be described as a living hell.  It is simply
> beyond the powers of human comprehension to imagine
> the desperation, horror and sheer terror that you
> inflicted on Ms. Raver and Mr. Fulton in the very last
> moments of their young lives.
>
> As to the impact of your crimes on the survivors
> of the children you slaughtered, the families they
> left behind, one does not need to imagine what your
> killings did to them for they have borne witness in
> this courtroom to the devastation you've left in your
> wake.

Finally, Prieto alleges that Judge Bellows "entirely discounted" Prieto's mitigating evidence.  Prieto argues that these factors combine to permit a reasonable perception of bias against him in resentencing.

Judge Bellows outlined his reasons for declining to recuse himself in what can only be described as a thoughtful and thorough 35-page memorandum decision.  He emphasized holdings by this Court clarifying instances that are not legitimate grounds for recusal, including the previous imposition of the death penalty against a given defendant, Justus v. Commonwealth, 222 Va. 667, 673, 283 S.E.2d 905, 908 (1981), cert. denied, 455 U.S. 983 (1982), and the formation or expression of an opinion as to the guilt of the accused based on information acquired during

13

judicial proceedings. Slayton v. Commonwealth, 185 Va. 371, 376, 38 S.E.2d 485, 488 (1946).

Additionally, Judge Bellows' written discussion of these issues notes that, "in examining the question of whether a trial judge has exhibited personal bias or prejudice, courts almost always require proof that the judge was influenced by . . . an extrajudicial source." See United States v. Grinnell Corp., 384 U.S. 563, 583 (1966). When, however, the recusal motion is based on comments occurring in the record, Judge Bellows correctly recognized that those comments must be taken in the context of the record as a whole. Thus, "a judge should recuse himself or herself whenever a reasonable person, with knowledge of all the facts of the case, would question the judge's impartiality." United States v. Mikalajunas, No. 91-5119, 1992 U.S. App. LEXIS 21054, at *6 (4th Cir. 1992) (citing Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 860 (1988)).

Judge Bellows accurately characterized the prevailing law in his memorandum decision, and it is clear that his refusal to recuse himself was not an abuse of discretion. See, e.g., Grattan v. Commonwealth, 278 Va. 602, 620, 685 S.E.2d 634, 644 (2009) (stating that a review for abuse of discretion "includes review to determine that the discretion was not guided by erroneous legal conclusions," and finding no abuse of discretion where the trial judge's decision reflected proper application of

governing legal principles).  Prieto offered no evidence or even allegation of extrajudicial influence that would suggest bias.  In the course of his judicial duty to evaluate the jury's death sentences, Judge Bellows was required by the laws of this Commonwealth to consider the vileness of the crime.  Given the task set before him, it is neither surprising nor inappropriate that the record contains emotional language.  It is not required nor desired that judges of the Commonwealth possess the ability to utterly set aside all human emotion while discharging their duties.

Finally, the record does not support Prieto's allegation that Judge Bellows entirely discounted Prieto's mitigating evidence as being of no value in the analysis.  To the contrary, the record states that Judge Bellows "carefully considered" that evidence but found that it did not warrant a reduction in penalty.

Judge Bellows discussed each of these issues exhaustively in his memorandum decision, which represents a fair construction of the law of the Commonwealth and interpretation of the facts.  We accordingly conclude that he did not abuse his discretion in refusing to recuse himself.  See, e.g., Grattan, 278 Va. at 620, 685 S.E.2d at 644.

15

## E. <u>Victim Impact Statements</u>

Prieto argues via multiple assignments of error that the circuit court erred in permitting victim impact testimony that was beyond the scope of Code § 19.2-264.4(A1) or was unduly prejudicial or irrelevant. As discussed in Part B, <u>supra</u>, his arguments addressing the victim impact testimony generally – that the testimony was cumulative and that it exceeded the allowable scope of victim impact testimony by referring to the impact on family members — were not preserved at trial and thus are procedurally defaulted. He additionally assigns error to the testimony of three specific witnesses, Major Deidre Raver, Lisa Barajas, and Velda Jefferson, whose testimony we will address in turn.

### 1. Testimony of Major Deidre Raver

Prieto alleges that victim impact statements made by Rachael Raver's sister, Major Deidre Raver, herself an alleged victim of an unreported rape many years prior, were improper and highly prejudicial. In particular, he objected to the following testimony by Major Raver:

> [L]ook at me, I'm 50 years old, I never got married. I don't think I ever will, and I'm not — it's one of those things where I don't think I'm capable of having a relationship after that.
>
> I mean, I myself was a rape survivor when I was very young, and I watched that — that guy got away with it. So now I have my sister who dies.

16

Prieto moved for a mistrial, arguing that the testimony implied "that this jury should give retribution for her personal victimization" from crimes committed by another individual. The circuit court, after temporarily excusing the jury to hear argument, instructed Major Raver that she could not testify to the circumstances of her own rape but could discuss any psychological injury that she suffered as a result of what she described as survivor's guilt following her sister's attack. The jurors returned, and the circuit court instructed them to "disregard Major Raver's statement that the person who raped her got away with it and give it no further consideration in this trial or in your deliberations."

Major Raver then further explained her psychological injury:

> Basically, you know, as a rape survivor myself, I had a lot of feelings of just guilt that my sister got murdered because I wasn't there to save her. . . . [B]eing a survivor yourself and a victim, and then you have a family member who is a victim, and they're younger than you, and you're not there to protect them and save them, the amount of guilt, it just — it makes it impossible to grieve.

Prieto argues that the circuit court erred in two ways: first, that the curative instruction was insufficient given the prejudicial nature of Major Raver's remarks and the time the jury had to ruminate over the remarks while they were dismissed from the courtroom; and second, that Major Raver's psychological

17

testimony related to fallout from another crime not alleged to have been committed by Prieto and should not have been admitted. Prieto does not contend that Raver's comments subsequent to the curative instruction exceeded the scope of the circuit court's ruling.  Thus, the issues before us are (1) whether the scope of her testimony concerning the psychological harm that she suffered was proper, and (2) whether the curative instruction was sufficient so as not to require a mistrial.

Generally, this Court has held and continues to hold that "victim impact testimony regarding a capital offense is admissible because it is probative of the depravity of mind component of the vileness predicate."  Andrews, 280 Va. at 291-92, 699 S.E.2d at 272 (citing Weeks v. Commonwealth, 248 Va. 460, 476, 450 S.E.2d 379, 389-90 (1994), cert. denied, 516 U.S. 829 (1995)).  Code § 19.2-264.4 provides that:

> A.  Upon a finding that the defendant is guilty of an offense which may be punishable by death, a proceeding shall be held which shall be limited to a determination as to whether the defendant shall be sentenced to death or life imprisonment. . . .
>
> A1.  In any proceeding conducted pursuant to this section, the court shall permit the victim, as defined in § 19.2-11.01, . . . to testify in the presence of the accused regarding the impact of the offense upon the victim.  The court shall limit the victim's testimony to the factors set forth in clauses (i) through (vi) of subsection A of § 19.2-299.1.

Code § 19.2-11.01(B) defines a victim as a person "who has suffered physical, psychological or economic harm as a direct

18

result of the commission of a felony" and the "spouse, parent, sibling, or legal guardian of such a person who . . . was the victim of a homicide," among others.

Virginia law is in accord with the decisions of the Supreme Court of the United States, holding that a " '[s]tate may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the . . . decision as to whether or not the death penalty shall be imposed.' " Beck v. Commonwealth, 253 Va. 373, 381, 484 S.E.2d 898, 903 (1997) (quoting Payne v. Tennessee, 501 U.S. 808, 827 (1991)), cert. denied, 522 U.S. 1018 (1997). "So long as [the] prejudicial effect does not outweigh its probative value, such evidence is beneficial to the determination of an individualized sentence as is required by the Eighth Amendment." Beck, 253 Va. at 382, 484 S.E.2d at 904 (citing Payne, 501 U.S. at 825).

Because of its relevance to the vileness aggravating factor only, this Court has held that victim impact testimony must be confined to the crime for which the defendant is being sentenced. Andrews, 280 Va. at 291-92, 699 S.E.2d at 272. As we explained in Andrews, "[v]ictim impact testimony regarding unadjudicated criminal conduct . . . is not relevant to the vileness predicate because the testimony concerns an offense

19

unrelated to the capital offense upon which the defendant is being sentenced."  Id. at 292, 699 S.E.2d at 272.

Prieto argues that this Court should consider Major Raver's own rape to be an unadjudicated act under Andrews and, accordingly, should find it irrelevant to the vileness aggravating factor and therefore inadmissible.  We disagree. Andrews pertains to instances in which there is some allegation that the defendant being sentenced also committed and should be held responsible for the unadjudicated act.  No reasonable juror could conclude from Major Raver's testimony that she was attempting to implicate Prieto in her own rape in any way.

Major Raver's victim impact testimony as a family member of the deceased is permitted under Code §§ 19.2-11.01(B) and 19.2-264.4.  The proper scope of Major Raver's testimony must therefore be evaluated as any other victim impact statement. The scope of testimony in the sentencing phase is wide, and the standard for exclusion of relevant evidence is whether the prejudicial effect substantially outweighs its probative value. Teleguz, 273 Va. at 482, 643 S.E.2d at 723.  This is a matter of discretion for the circuit court and is properly reviewed under an abuse of discretion standard.  Id.

Here, the circuit court directed the witness to narrow the scope of her testimony to the impact that her sister's murder had on her own life.  Her own previous experiences were raised

20

in the context of this discussion.  This testimony, however, was not "so far removed from the victims as to have nothing of value to impart" about the impact of the murder, Beck, 253 Va. at 385, 484 S.E.2d at 906, and the circuit court did not abuse its discretion in allowing the testimony.

Additionally, we must consider whether Major Raver's original statement that her rapist "got away with it" was so prejudicial as to warrant a mistrial.  In this evaluation, we review whether the jury was "promptly, explicitly and carefully instructed" to disregard the inappropriate testimony, Lewis v. Commonwealth, 211 Va. 80, 84, 175 S.E.2d 236, 238 (1970), and consider the nature of the arguably inflammatory material in relation to the rest of the evidence in the case.  Fowlkes v. Commonwealth, 52 Va. App. 241, 252, 255, 663 S.E.2d 98, 103, 105 (2008).

There is no question that the trial judge's instruction was explicit and careful.  Prieto argues that it was not prompt in that it was not immediate because the jury was dismissed while the circuit court heard oral argument on the matter, leaving the jurors with time to ruminate on Major Raver's statement.  Judges routinely abide by this practice, however, when considering issues of consequence.  Indeed, judges must be given the opportunity, when necessary, to hear thorough argument on an evidentiary issue before ruling.  We find that the circuit

court's proper and prompt curative instruction upon the jury's return immediately after hearing oral argument was appropriate and sufficient to meet the standard set forth in Lewis. As we have stated in the past, "[a] jury is presumed to have followed the instructions of the trial court." Muhammad, 269 Va. at 524, 619 S.E.2d at 58. We therefore have no basis from which to conclude that a mistrial was necessary.

Finally, when the nature of the challenged testimony is viewed in light of the context and other incidents of the case, it becomes clear that the trial judge did not abuse his discretion in refusing to grant a second mistrial. No accusation was ever made that Prieto had any connection with Major Raver's rape. Despite having had time to ruminate over her statement, in the situation presented, no reasonable juror would assume that he or she was implicitly invited, as Prieto alleges, to levy additional retribution upon him arising from unrelated crimes committed long ago against Major Raver. We accordingly find that the circuit court did not abuse its discretion in refusing to grant a mistrial or bar subsequent testimony from Major Raver.

### 2. Testimony of Lisa Barajas

Lisa Barajas testified to events that took place in California in 1990 in which she, her mother Emily Devila, and Yvette Woodruff were kidnapped and raped by Prieto and two other

22

men, and Yvette was murdered.  Prieto was convicted of "(1) one count of first degree murder with a robbery-murder, a kidnapping-murder, and a rape-murder special circumstance; (2) two counts of attempted willful, deliberate, and premeditated murder; (3) two counts of attempted robbery; (4) two counts of robbery; (5) three counts of kidnapping for robbery; (6) three counts of forcible rape; and (7) one count of possession of a firearm by a felon."  People v. Prieto, 66 P.3d 1123, 1130-31 (Cal.) (internal citations omitted), cert. denied, 540 U.S. 1008 (2003).

"The use of prior criminal convictions and prior unadjudicated criminal conduct as evidence of [the] 'future dangerousness' [predicate of a capital offense] has been consistently approved" by this Court.  Watkins v. Commonwealth, 238 Va. 341, 352, 385 S.E.2d 50, 56 (1989), cert. denied, 494 U.S. 1074 (1990).  The scope of testimony regarding prior acts, as probative of future dangerousness, is limited to the actual events and does not extend to the impact of the events on the victims.

Prieto has two primary objections.  The first is that Barajas' testimony addressed the actions of Prieto's codefendant rather than Prieto himself and is therefore irrelevant and prejudicial.  The second is that portions of the testimony constitute victim impact statements, which are not admissible

23

for crimes other than the one for which the defendant is being sentenced.

The first issue arises in part because California law does not distinguish convictions between principal actors and agents in the second degree or aiders and abettors. See Prieto, 66 P.3d at 1140 ("[D]efendant could be found guilty if the charged crime was the natural and probable consequence of another crime that he intentionally aided and abetted."). The record indicates that each man was the primary rapist of a different woman, and Barajas made clear throughout her testimony that Prieto was not her physical rapist. Prieto seeks, therefore, to exclude her testimony as irrelevant to his future dangerousness.

Barajas' testimony, however, was highly relevant to Prieto. Barajas indicated that the three men worked together in a coordinated effort to commit the offenses. Although she mentioned her own rape and that she was bitten during it, a review of her testimony reveals that it was narrowly tailored to describing the general events and Prieto's involvement in the crimes. In fact, the most inflammatory remarks, during which she described lying in the dirt pretending to be dead waiting to be stabbed, are in fact those most directly related to Prieto: she recounted him having a conversation with her rapist and asking her primary attacker whether he had killed her yet. Her testimony was thus highly probative as to the future

24

dangerousness aggravating factor, and it cannot be said that the circuit court abused its discretion in allowing the testimony.

Prieto also argues that Barajas' testimony strayed into impermissible "victim impact" territory when describing seeing "Yvette, like sitting, slumped up against the tree." A review of the testimony shows that this argument is baseless. Barajas did not elaborate on the impact of the trauma on her life; she merely described the events as they occurred and explained her location in relation to Yvette. The circuit court was well within its discretion in admitting this testimony as relevant to the future dangerousness aggravating factor.

### 3. Testimony of Velda Jefferson

Prieto argues that the circuit court erred in allowing victim impact testimony arising from unadjudicated acts. Unadjudicated acts are admissible in the sentencing phase of a capital trial in Virginia, but only as to the issue of future dangerousness. Stockton v. Commonwealth, 241 Va. 192, 209, 402 S.E.2d 196, 206, cert. denied, 502 U.S. 902 (1991). Victim impact testimony addresses the vileness of a crime and so is only appropriate in the context of the offense for which the defendant is being sentenced.

The testimony in dispute is that of Velda Jefferson, the mother of Veronica Jefferson. Veronica was found dead and partially naked in a school yard in 1988 at the age of 28, an

25

apparent victim of rape and murder. In 1999, a DNA profile implicated Prieto. Detectives and forensic officers were brought forward to testify to the actual circumstances of the murder and the discovery of DNA evidence from a vaginal swab of Veronica. In addition, Velda testified briefly: her testimony spanned only about eleven pages of transcript, about half of which encompassed argument between counsel over objections about the scope of the testimony.

Prieto's only timely objection relating to victim impact testimony concerned Velda's statements that Veronica was in a committed relationship with her boyfriend. At sidebar, the Commonwealth clarified that the mother's testimony was offered not as victim impact testimony but rather to show that it was unlikely that any sexual contact with Prieto was consensual. It was certainly within the purview of the circuit court to admit this factual testimony.

Prieto also assigns error to other aspects of Velda's testimony, such as the last time she spoke to Veronica. There was no contemporaneous objection that this constituted inadmissible victim impact testimony. Accordingly, as discussed in Part B, supra, these assignments of error are defaulted under Rule 5:25.

### F.   Unadjudicated Acts Arising from the Murder of Veronica Jefferson

26

Prieto further alleges that, even if it did not constitute victim impact testimony, the circuit court erred in admitting testimony of unadjudicated acts arising from Veronica Jefferson's murder. Specifically, Prieto argues (1) that if unadjudicated acts are to be admitted, they require a high threshold of reliability which is absent here, and (2) that due to the decades of time elapsed since the commission of the unadjudicated act, it is not indicative of future dangerousness as required by Virginia law.

This Court has previously held evidence of unadjudicated acts to be admissible in sentencing as probative of future dangerousness. Stockton, 241 Va. at 209, 402 S.E.2d at 206. We have rejected Prieto's argument that evidence of an unadjudicated crime is not reliable. Beaver v. Commonwealth, 232 Va. 521, 529, 352 S.E.2d 342, 347, cert. denied, 483 U.S. 1033 (1987). Indeed, we have said that " 'a trier of fact called upon to decide whether . . . to impose the death penalty is entitled to know as much relevant information about the defendant as possible.' " Quesinberry v. Commonwealth, 241 Va. 364, 379, 402 S.E.2d 218, 227 (omission in original) (quoting Beaver, 232 Va. at 529, 352 S.E.2d at 347), cert. denied, 502 U.S. 834 (1991). We have also rejected the argument that such testimony is inherently prejudicial. Gray v. Commonwealth, 233

27

Va. 313, 346-47 & n.8, 356 S.E.2d 157, 175-76 & n.8, <u>cert. denied</u>, 484 U.S. 873 (1987).

The Supreme Court of the United States has rejected the argument that specific prior unadjudicated acts must be established beyond a reasonable doubt to be admissible. <u>See generally</u> <u>Huddleston v. United States</u>, 485 U.S. 681, 690 n.7 (1988) ("[T]he trial court neither weighs credibility nor makes a finding that the Government has proved the conditional fact by [even] a preponderance of the evidence. The court simply examines all the evidence in the case and decides whether the jury could reasonably find [that the prior act took place]."). <u>See also</u> <u>Pavlick v. Commonwealth</u>, 27 Va. App. 219, 227, 497 S.E.2d 920, 924 (1998) (holding that the <u>Huddleston</u> standard for proof that a prior bad act took place is in accord with Virginia law). With respect to the sentence phase of a capital murder trial, this Court has specifically rejected the argument that individual unadjudicated acts require an elevated degree of reliability, requiring only that the evidence on the whole must be sufficient to permit a jury to make the ultimate finding of future dangerousness or vileness beyond a reasonable doubt in order to impose the death penalty. <u>Walker v. Commonwealth</u>, 258 Va. 54, 64-66, 515 S.E.2d 565, 571-72 (1999), <u>cert. denied</u>, 528 U.S. 1125 (2000).

Prieto argues that his due process rights were violated because the evidence of unadjudicated acts was not accompanied by evidence suggesting its predictive reliability. The Commonwealth did not provide expert testimony discussing the predictive nature of events occurring decades prior to trial. It does not appear that this Court has ever specifically addressed whether the Commonwealth bears a burden, in proving future dangerousness beyond a reasonable doubt, to present expert witnesses to draw a nexus between past and future behavior.

It is true that, in some previous capital cases, the Commonwealth provided this sort of nexus. In Beaver, for example, the prosecution presented an expert witness who testified that the defendant's psychological profile was "a highly consistent profile reflecting personality traits of long duration. It is not likely to change much with time . . . . Treatment or rehabilitation programs tend not to be very successful for individuals with this profile type." 232 Va. at 532, 352 S.E.2d at 348-49 (emphasis omitted).

On the other hand, neither this Court nor the Supreme Court of the United States has ever specifically required expert testimony providing this nexus, stating instead that the jury was entitled to as much information as possible in the sentencing phase so as to make an informed decision based on the

29

individual in question.  Payne, 501 U.S. at 821.  Thus, there is no support for the argument that the law places such a burden on the prosecution.  Certainly, the defense had the opportunity to refute both the accuracy and the predictive nature of this 20-year-old allegation.  Prieto failed to do so at trial.

### G.  Mitigation Instructions and Testimony

#### 1.  Mitigation "of the Offense"

Prieto alleges that the circuit court erred, both in instructing the jury and in the verdict forms, by including the allegedly limiting term "of the offense" following "aggravation and mitigation."  Specifically, the jury verdict forms stated that "We the jury . . . having considered all the evidence in aggravation and mitigation of the offense. . . ."  Prieto argues that this erroneously narrowed the jurors' focus to the offense at hand and would lead them to believe that they could not consider the larger mitigating evidence of his early life.

This argument is without merit.  The language on the verdict forms tracks the statutory language from Code § 19.2-264.4 and is consistent with Virginia law.  In addition, the jury instructions given by the circuit court repeatedly refer generally to evidence in mitigation without the phraseology "of the offense."  Finally, the jury's deliberation followed days of mitigating evidence not directly related to the offense, with no limiting instruction from the circuit court.  A reasonable jury

30

would not have gathered from the circuit court's instructions and the circumstances of the trial that it was compelled to discount any of the evidence presented.  Instead, the instructions referred to consideration of all the mitigating evidence.

## 2.  Limitations on Mitigating Testimony

Prieto argues that the circuit court erred in unduly limiting mitigating evidence in testimony from Dr. James Garbarino, Teodora Alvarado, and Yolanda Loucel.  But a review of the record clearly shows that objections sustained during the questioning pertained to the method of questioning, such as leading the witnesses or posing vague questions.  In all instances the circuit court allowed counsel the opportunity to rephrase the questions to obtain the desired information.  Although the scope of admissible mitigating evidence is wide, it is in the sound discretion of the circuit court to supervise the presentation of witnesses.  See, e.g., Williams v. Commonwealth, 248 Va. 528, 542, 450 S.E.2d 365, 374 (1994) (stating that the determination of the permissible scope of witness testimony is "committed to the sound discretion of the trial court"), cert. denied, 515 U.S. 1161 (1995).  Here, there is no evidence that the circuit court abused its discretion or that its rulings were prejudicial to Prieto in any way.

H.  Appointment of the Commonwealth's Mental Health Expert

Prieto contends that the circuit court erred in appointing Dr. Samenow as the Commonwealth's mental health expert under Code § 19.2-264.3:1(F). We disagree.

Code § 19.2-264.3:1 provides that, in the event of a conviction, a defendant charged with capital murder intending to present expert testimony to support a claim in mitigation relating to his history, character, or mental condition, may be subject to evaluation by one or more of the Commonwealth's own mental health experts. The expert appointed must be "(i) a psychiatrist, a clinical psychologist, or an individual with a doctorate degree in clinical psychology who has successfully completed forensic evaluation training as approved by the Commissioner of Behavioral Health and Developmental Services and (ii) qualified by specialized training and experience to perform forensic evaluations." Code § 19.2-264.3:1(A), (F).

Prieto does not dispute that Dr. Samenow satisfied these professional requirements. Instead, Prieto argues that Dr. Samenow was not qualified for appointment because he "has exhibited significant bias" throughout his career "against the possibility of mitigating evidence based on a defendant's history or background."

To support this claim, Prieto first relies on Dr. Samenow's opinions, expressed in a book and newspaper article, that criminals think differently, that sociological and physiological

32

determinism merely provides excuses to criminals, and that criminals freely choose their way of life.  See Stanton E. Samenow, Inside the Criminal Mind (2004); Stanton E. Samenow, "Psyching Out Crime Excuses," The Washington Times, Aug. 25, 2004.  Next, Prieto cites an opinion from the United States Court of Appeals for the Fourth Circuit, in which one judge noted:  "Dr. Samenow's professed and public views make him incompetent to aid a defendant in finding and presenting mitigating factors at a defendant's sentencing phase."  Ramdass v. Angelone, 187 F.3d 396, 411 n.1 (4th Cir. 1999) (Murnaghan, J., concurring in part and dissenting in part).  Lastly, Prieto points to Dr. Samenow's testimony that Prieto was "superficially polite," uncooperative, and remorseless during the examination.

Even if Dr. Samenow is biased against mitigating evidence as Prieto alleges, we fail to see how that bias disqualified Dr. Samenow from being appointed as the Commonwealth's mental health expert under Code § 19.2-264.3:1(F).  Unlike the circumstances presented in Ramdass, Dr. Samenow was not appointed in this case to "assist the defense in the preparation and presentation" of mitigating evidence.  Code § 19.2-264.3:1(A).  Instead, he was appointed to assist the prosecution in rebutting such evidence.  Code § 19.2-264.3:1(F).  Thus, because there is no question that Dr. Samenow satisfied the professional requirements for appointment set out in Code § 19.2-264.3:1(A), we conclude that

33

the circuit court did not abuse its discretion in appointing him as the Commonwealth's mental health expert under Code § 19.2-264.3:1(F).

## I.  Right Against Self-incrimination

Prieto asserts that the circuit court violated his Fifth Amendment right against self-incrimination by: (1) allowing Dr. Samenow to question him about the circumstances of the underlying offenses, (2) allowing Dr. Samenow to testify that he was uncooperative, and (3) allowing the Commonwealth to argue that it had "waited in vain to hear an ounce of remorse" from him.  We address these arguments in turn.

### 1.  Questions About Underlying Offenses

Prieto claims that the circuit court erred in allowing Dr. Samenow to question him about the underlying offenses during the evaluation.  "[W]here a defendant limits his proposed mitigation evidence to his history and character and invokes his right to remain silent regarding the criminal charges against him," Prieto argues, "the Commonwealth cannot force the defendant to choose between his constitutional right to remain silent and his constitutional right to present relevant mitigating evidence."  Accordingly, Prieto maintains, the Commonwealth should have been "barred from forcing [him] to answer questions about his offenses when his mental state is not at issue."

34

We rejected a similar argument in Savino v. Commonwealth, 239 Va. 534, 391 S.E.2d 276, cert. denied, 498 U.S. 882 (1990). There, the defendant claimed that Code § 19.2-264.3:1 violated (among other things) his Fifth Amendment rights. Id. at 543-44, 391 S.E.2d at 281. We disagreed, holding that when a defendant gives notice of his intention to use a mental health expert's evaluation as mitigating evidence in accordance with Code § 19.2-264.3:1(E), he waives his right against the introduction of psychiatric testimony. Id. at 544, 391 S.E.2d at 281. We have since applied Savino's rationale to hold that Code § 19.2-264.3:1(F) "do[es] not limit the scope of the expert's examination to matters of mitigation" and that therefore the Commonwealth's mental health expert may evaluate a defendant's future dangerousness. Stewart v. Commonwealth, 245 Va. 222, 243, 427 S.E.2d 394, 408, cert. denied, 510 U.S. 848 (1993).

In light of these holdings, we believe that the circuit court did not err in allowing Dr. Samenow to question Prieto about the underlying offenses, because Prieto waived his Fifth Amendment rights when he gave notice of his intention to use his mental health expert's evaluation as mitigating evidence.

### 2. Prieto's Failure to Cooperate

Prieto contends that Dr. Samenow's testimony that he was uncooperative during the evaluation was not only false, but it was also "punishment . . . for [his] legitimate exercise of his

constitutional right[]" to remain silent.  He thus submits that it should have been excluded by the circuit court.  We disagree.  First, as noted above, a defendant waives his Fifth Amendment rights when he gives notice of his intention to use his mental health expert's evaluation as mitigating evidence.  Second, the record fully supports the circuit court's finding that "there was a partial failure to cooperate" on Prieto's part during Dr. Samenow's evaluation.  Accordingly, we conclude that the circuit court did not err in allowing Dr. Samenow to testify about Prieto's "refusal to cooperate" during the evaluation, in accordance with Code § 19.2-264.3:1(F)(2).

3.  Commonwealth's Comment on Prieto's Lack of Remorse

Prieto claims that "[t]he Commonwealth exploited [his] silence in violation of his Fifth Amendment rights and in violation of Article 1, Section 8 of the Virginia Constitution, when [it] argued in closing argument that it ha[d] 'waited in vain to hear an ounce of remorse leak out anywhere, but there was none."  We disagree.

To determine whether a prosecutor's comment violates a defendant's right to remain silent, we have set forth the following test:  "[W]hether, in the circumstances of the particular case, the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the

36

accused to testify." Hines v. Commonwealth, 217 Va. 905, 907, 234 S.E.2d 262, 263 (1977) (internal quotation marks and citation omitted). Here, as the Commonwealth points out, several witnesses, including mental health experts, were asked during the resentencing proceeding whether Prieto had expressed any remorse, and they said "no." We therefore conclude that, as the circuit court found, the Commonwealth's comment on Prieto's lack of remorse was not "a comment on his failure to testify," but rather a comment on the evidence that had been presented.

J. Jury View of Red Onion State Prison

Prieto asserts that the circuit court erred in denying his motion for a jury view of Red Onion State Prison under Code § 19.2-264.1. Quoting our decision in P. Lorillard Co. v. Clay, 127 Va. 734, 744, 104 S.E. 384, 387 (1920), he submits that "[a] view should be granted when it would be 'of substantial aid to the jury in reaching a correct verdict.' " He advances three reasons why a view of Red Onion would have been a "substantial aid" to the jury in reaching a correct verdict in his case. First, it "would have enabled the jury to correctly decide whether [he] would be a future danger to the prison society — the inmates and correctional officers — at Red Onion, given its conditions as a 'super max' facility." Second, "it would have prevented jury speculation on [his future dangerousness], as living within a super max facility is outside the common

experience of the typical juror." Third, it "would have enabled the jury to assess the credibility of trial witnesses testifying on the issue of [his] future dangerousness."

As we have previously held and as discussed in Part II.C.3, supra, the future dangerousness aggravating factor refers not to the prison population but to society as a whole. The circumstances of Red Onion were, therefore, irrelevant and would not have been an aid to the jury in their evaluation of Prieto's future dangerousness.

Under Code § 19.2-264.1, "[t]he jury in any criminal case may . . . be taken to view the premises or place in question, or any property, matter or thing relating to the case, when it shall appear to the court that such view is necessary to a just decision." " 'The question of the propriety of ordering a view,' " we have said, " 'lies largely in the discretion of the trial court which should only grant it when it is reasonably certain that it will be of substantial aid to the jury in reaching a correct verdict and whose decision will not be reversed unless the record shows that a view was necessary to a just decision.' " P. Lorillard Co., 127 Va. at 744, 104 S.E. at 387 (quoting Abernathy v. Emporia Mfg. Co., 122 Va. 406, 424, 95 S.E. 418, 423 (1918)).

We do not believe that a view of Red Onion was necessary to a just decision on Prieto's future dangerousness. We have

38

consistently held that there is no constitutional limitation to the circuit court's authority

> to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.  Thus, the relevant inquiry is not whether [Prieto] could commit criminal acts of violence in the future but whether he would. . . .  Accordingly, the focus must be on the particular facts of [Prieto's] history and background, and the circumstances of [the] offense. . . . Evidence regarding the general nature of prison life in a maximum security facility is not relevant to [the determination of future dangerousness], even when offered in rebuttal.

Burns v. Commonwealth, 261 Va. 307, 339-40, 541 S.E.2d 872, 893 (internal quotation marks and citations omitted), cert. denied, 534 U.S. 1034 (2001).  Since evidence on the general nature of prison life in a maximum-security facility was not even relevant to the determination of Prieto's future dangerousness, we fail to see how a view of such a facility was necessary to a just decision on that issue.  Consequently, we hold that the circuit court did not abuse its discretion in denying Prieto's motion for a view of Red Onion.

### K.  Vileness Aggravating Factor

Prieto asserts that the circuit court erred in denying his motion to declare the vileness aggravating factor in Code § 19.2-264.2 unconstitutional.  Under that statute, an offense is "outrageously or wantonly vile" if "it involved torture, depravity of mind or an aggravated battery to the victim."

39

Prieto submits that torture, depravity of mind, and aggravated battery are elements of the vileness aggravating factor. Thus, he contends, under Richardson v. United States, 526 U.S. 813 (1999), "a Virginia capital jury considering the vileness aggravating factor must unanimously agree upon which elements of vileness form the basis of its finding of vileness."

Prieto further claims that, "[b]ecause Richardson compels recognition of Virginia's vileness sub-elements as offense elements, Ring v. Arizona, 536 U.S. 584 (2002), requires the jury to find at least one of the three vileness elements beyond a reasonable doubt." "To satisfy Ring," he argues, "Virginia's capital sentencing scheme must require that at least one specific vileness element be proven beyond a reasonable doubt and agreed upon unanimously by the jury." Since it does not so require, he maintains that it "cannot be applied consistent with the federal constitution."

We find Prieto's contention unpersuasive. To begin with, in Clark v. Commonwealth, 220 Va. 201, 257 S.E.2d 784 (1979), cert. denied, 444 U.S. 104 (1980), we rejected the argument that a jury must identify the element or elements of the vileness aggravating factor that it relied on in reaching its decision. Id. at 213, 258 S.E.2d at 791-92. And just a few years ago, we determined that our decision in Clark was unaffected by

Richardson.  Jackson v. Commonwealth, 266 Va. 423, 587 S.E.2d 532 (2003), cert. denied, 543 U.S. 842 (2004).

In Jackson, the defendant argued that, under Richardson, "due process requires unanimity not only as to the aggravating factor of vileness but also to one or more of its composite elements."  Id. at 434, 587 S.E.2d at 541.  We disagreed, stating:

> The Supreme Court [of the United States] explained in Richardson that, for example, the jury must unanimously find force as an element of the crime of robbery, but whether the force is created by the use of a gun or a knife is not an element of the crime and therefore does not require jury unanimity.  In this case, the element the jury was required to find unanimously to impose the death sentence was the aggravating factor of vileness, which requires the defendant's actions be outrageously or wantonly vile, horrible, or inhuman.  Depravity of mind, aggravated battery, and torture are not discrete elements of vileness that would require separate proof but rather are several possible sets of underlying facts [that] make up [the] particular element.  Neither Clark nor Richardson, therefore, requires juror unanimity on these points.

Id. at 434-35, 587 S.E.2d at 541 (alterations in original) (internal quotation marks and citations omitted).

This reasoning is unaffected by Ring.  That case involved Arizona's capital-sentencing scheme, which mandated that a judge — not a jury — determine the presence or absence of certain aggravating factors necessary to impose a sentence of death.  Ring, 536 U.S. at 588.  The Supreme Court of the United States held that the capital-sentencing scheme was unconstitutional

41

because defendants "are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." Id. at 589. In reaching this conclusion, the Supreme Court said nothing about unanimity in state-court verdicts, and for good reason: The Sixth Amendment "does not require a unanimous jury verdict in state criminal trials." McDonald v. City of Chicago, ___ U.S. ___, ___, 130 S.Ct. 3020, 3035 n.14 (2010); see also Apodaca v. Oregon, 406 U.S. 404, 406 (1972). Moreover, we have previously found that Virginia's capital-sentencing scheme "do[es] not suffer from the same issues that were addressed in Ring because the aggravating factors are submitted for the jury to determine." Porter v. Commonwealth, 276 Va. 203, 265, 661 S.E.2d 415, 447 (2008) (citing Muhammad v. Commonwealth, 269 Va. 451, 491, 619 S.E.2d 16, 39 (2005), cert. denied, 547 U.S. 1136 (2006)), cert. denied, ___ U.S. ___, 129 S.Ct. 1999 (2009).

Accordingly, we conclude that the circuit court did not err in denying Prieto's motion to declare the vileness aggravating factor in Code § 19.2-264.2 unconstitutional.

### L. Request for Grand Jury Information

Before the resentencing proceeding, Prieto sought to challenge the composition of the grand jury that indicted him in 2005. To that end, he moved for information on each grand jury from January 2003 through November 2005. The circuit court

42

denied the motion, concluding (1) that "the request for grand jury information ha[d] been waived because it was not raised prior to trial," as required by Rule 3A:9(c), and (2) that no good cause had been shown to grant relief from the waiver.

Under Rule 3A:9(b)(1), "[d]efenses and objections based on defects in the institution of the prosecution or in the written charge upon which the accused is to be tried . . . must be raised by motion made within the time prescribed by paragraph (c) of this Rule." Paragraph (c), in turn, provides that "[a] motion referred to in subparagraph (b)(1) shall be filed or made before a plea is entered and, in a circuit court, at least 7 days before the day fixed for trial." Rule 3A:9(c). Failure to comply with these requirements constitutes a waiver. Rule 3A:9(b)(1). For good cause, however, relief from any waiver may be granted under Rule 3A:9(d).

Prieto contends that the circuit court erred in finding that he waived his request for grand jury information under Rule 3A:9(b)(1), because he filed his motion more than 7 days before his resentencing proceeding. We disagree.

Rule 3A:9(c), as just noted, requires not only that a motion challenging an indictment be filed 7 days before trial, but also that it be filed "before a plea is entered." (Emphasis added.) A resentencing proceeding is not a "trial." There was no reversible error found in the guilt phase of Prieto's first

43

conviction, all convictions were affirmed, and only the two sentences of death were reversed and remanded to the circuit court for a new penalty proceeding on the capital murder convictions. Prieto I, 278 Va. at 418, 682 S.E.2d at 938. But even assuming, arguendo, that a resentencing proceeding is a "trial" and that therefore Prieto complied with the first of Rule 3A:9(c)'s requirements by filing his motion more than 7 days before that proceeding, there can be no doubt that he failed to comply with the second because his motion was filed years after he entered a plea.

We have long held to the rule that a defendant's objection to the grand jury must be made before a plea is entered. In Curtis v. Commonwealth, 87 Va. 589, 13 S.E. 73 (1891), for instance, the defendant's first-degree murder conviction was set aside by the circuit court. On retrial, the defendant moved to quash the indictment "on the ground that it did not affirmatively appear from the record that a venire facias had been issued to summon the grand jury by which the indictment had been found." Id. at 591, 13 S.E. at 74. The circuit court denied the motion, and we affirmed that ruling. In doing so, we stated that

> it is well settled that objections to the mode of
> summoning a grand jury, or to the disqualifications of
> particular jurors, must be made at a preliminary stage
> of the case, that is, before a plea to the merits;

44

otherwise they will be considered as waived unless, indeed, the proceeding be void ab initio.

Id. at 592, 13 S.E. at 74.

In a more recent decision, Bailey v. Commonwealth, 193 Va. 814, 71 S.E.2d 368 (1952), we rejected the defendant's claim that, because racial discrimination in the selection of grand jurors is prohibited by the Fourteenth Amendment, the right to object to it at any time cannot be waived.  Although a defendant has "a constitutional right to a fair and impartial grand jury from which members of his race had not been intentionally excluded," we explained, "that does not mean that there is no limitation of time, mode or circumstance upon his right to object to the grand jury which returned the indictment against him."  Id. at 820-21, 71 S.E. at 371.

There are many important interests served by placing such limitations on a defendant's right to object to the composition of the grand jury.  Those interests, as the Supreme Court of the United States has observed, include:

> the possible avoidance of an unnecessary trial or of a retrial, the difficulty of making factual determinations concerning grand juries long after the indictment has been handed down and the grand jury disbanded, and the potential disruption to numerous convictions of finding a defect in a grand jury only after the jury has handed down indictments in many cases.

Coleman v. Thompson, 501 U.S. 722, 745-46 (1991).

45

Because Prieto failed to raise his challenge to the composition of the grand jury before he entered a plea, as Rule 3A:9(c) and our precedents require, we conclude that the circuit court did not err in finding that his request for grand jury information was waived.

Prieto further argues that, even if he waived his request for grand jury information, the circuit court nonetheless erred in denying his motion because good cause was shown to grant relief from the waiver under Rule 3A:9(d). He does not say, however, what that good cause was; rather, he submits that he should have been excused from the waiver because "death is different." While we acknowledge that death is the ultimate punishment, that is not itself reason enough to grant him relief from the waiver, for we have routinely found waiver in capital cases. See, e.g., Schmitt v. Commonwealth, 262 Va. 127, 148, 547 S.E.2d 186, 201 (2001) (refusing to address the merits of a number of the defendant's arguments because timely objections were not made in the circuit court), cert. denied, 534 U.S. 1094 (2002).

Since Prieto failed to show good cause why he should be excused under Rule 3A:9(d) from the waiver of his right to challenge the composition of the grand jury, we hold that the circuit court did not err in denying his motion for grand jury information.

M.  Request for Petit Jury Information

To mount a Sixth Amendment fair-cross-section challenge to Fairfax County's jury selection process, Prieto moved for petit jury information, including master jury lists, for the 2008, 2009, and 2010 terms.  The circuit court granted him access to information for the 2010 term, but denied him access to information for the 2008 and 2009 terms.  He argues that the circuit court erred in denying him access to information for the 2008 and 2009 terms because he was entitled to that information "to ensure constitutional compliance of the jury selected for his trial."

Under Code § 8.01-347, after a master jury list is created, "the commissioners shall cause all the names thereon to be fairly written, each on a separate paper or ballot . . . and shall deposit the ballots with the list in a secure box," which "shall be locked and safely kept . . . and opened only by the direction of the judge."  In Archer v. Mayes, 213 Va. 633, 640, 194 S.E.2d 707, 712 (1973), we said that there was nothing in Code § 8-184 (§ 8.01-347's predecessor) that "deprives the judge of the court [of] discretion, where good cause is shown, to permit an examination of the jury list."  We further explained:

> But it cannot be inferred that the jury list shall be
> opened for inspection to members of the bar or private
> citizens without assigning good and sufficient reasons
> therefor.  The proper administration of justice
> requires that the jury list be kept secret until the

47

jurors are drawn for service, unless good cause be shown. The jury list is in no sense a public record to be exposed to the general public. Exposure of the list to the public could lead to tampering with and harassment of potential jurors and seriously affect their impartiality and the proper administration of justice. Even when good cause is shown, the inspection of the list shall be permitted only under the "watchful eye" of the court, and copying or photostating the list is not to be permitted.

Id. at 640-41, 194 S.E.2d at 712.

Prieto contends that the good-cause standard enunciated in Archer does not apply to the disclosure of an expired jury list because there is no risk that its release will affect the proper administration of justice. Even if that standard does apply, he continues, it was met here, since the circuit court granted him access to the jury list for the 2010 term.

The disclosure of an expired jury list does not raise the same tampering or harassment concerns that the disclosure of a current jury list does, but it still raises privacy concerns. A jury list contains sensitive information that should be protected. We thus believe that a good-cause standard is appropriate for the release of both a current and expired jury list.

The Commonwealth does not dispute that Prieto satisfied the good-cause standard for the disclosure of the jury list for the 2010 term, for we have previously held that good cause is shown when a defendant seeks access to the jury list from which his

48

venire will be selected "for the purpose of determining whether the jury selection procedures required by law and by the Constitution of the United States and the Constitution of Virginia [are] complied with." Eccles v. Commonwealth, 212 Va. 679, 680, 187 S.E. 2d 207, 207 (1972). But it contends that he did not do so for the release of the jury lists for the 2008 and 2009 terms because "any alleged violation in the composition of [his] jury could only occur in the process used to select the master list for 2010, from which his sentencing jury would be drawn."

We disagree with the Commonwealth that the jury lists for the 2008 and 2009 terms were irrelevant to Prieto's investigation into whether Fairfax County's jury selection process violated his Sixth Amendment right to be tried by an impartial jury drawn from a fair cross section of the community. The lists could have been used to show that any constitutionally significant underrepresentation of a distinctive group on Fairfax County's venires was due to systematic exclusion, rather than chance. As discussed below, however, we find that Prieto was not prejudiced by not having access to the lists because he failed to establish that there was any constitutionally significant underrepresentation of a distinctive group in the venire from which his jury would be selected. Without such underrepresentation, Prieto could not make a claim of systematic

49

exclusion.  For this reason, we conclude that the circuit court did not err in denying Prieto access to the lists.

## N.  Fair-Cross-Section Claim

Prieto asserts that the circuit court erred in denying his motion to strike the qualified jury list because Fairfax County's jury selection process systematically excluded African-Americans and Hispanics, in violation of his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community.  We disagree.

"To establish a prima facie violation of the fair-cross-section requirement," the Supreme Court of the United States has instructed, "a defendant must prove that:  (1) a group qualifying as 'distinctive' (2) is not fairly and reasonably represented in jury venires, and (3) 'systematic exclusion' in the jury selection process accounts for the underrepresentation."  Berghuis v. Smith, 559 U.S. ___, ___, 130 S.Ct. 1382, 1392 (2010) (quoting Duren v. Missouri, 439 U.S. 357, 364 (1979)).  The circuit court found that Prieto satisfied the first element because "African-Americans and Hispanics are clearly distinctive groups in the community."  But it determined that he did not meet the second element because the alleged disparities between the African-American and Hispanic populations in Fairfax County and the number of African-

Americans and Hispanics in the venire did not rise to the level of unfair or unreasonable.

According to Prieto's expert, Dr. Andrew A. Beveridge, by an "absolute disparity" measure,[3] African-Americans and Hispanics were underrepresented by 1.98% and 2.36% in Fairfax County's venires. And by a "comparative disparity" measure,[4] African-Americans and Hispanics were underrepresented by 22.05% and 31.51%.[5] The Supreme Court has not specified which of these measurements should be used in analyzing a fair-cross-section claim and has recently observed that both are imperfect because they "can be misleading when, as here, 'members of the distinctive group comp[ose] [only] a small percentage of those eligible for jury service.' " Berghuis, 559 U.S. at ___, 130 S.Ct. at 1393 (alterations in original) (quoting People v. Smith, 615 N.W.2d 1, 2-3 (Mich. 2000)). We need not resolve

_____

[3] "Absolute disparity" is determined by subtracting the percentage of a distinctive group in the jury pool from the percentage of that group in the jury-eligible population. Berghuis, 559 U.S. at ___, 130 S.Ct. at 1390.

[4] "Comparative disparity" is determined by dividing the absolute disparity of a distinctive group by the percentage of that group in the jury-eligible population. Berghuis, 559 U.S. at ___, 130 S.Ct. at 1390.

[5] For purposes of our analysis, we accept Dr. Beveridge's underrepresentation figures. We note, however, that there is considerable doubt as to their accuracy. For instance, Dr. Beveridge did not know whether the census data he used included the towns of Herndon and Vienna, which are part of Fairfax County. He also acknowledged that the census data he used did include the city of Falls Church, which is not part of Fairfax County.

today which measurement should be used in evaluating such a claim in the Commonwealth because neither the absolute nor comparative disparities in this case are constitutionally significant.

The absolute disparities here (1.98% and 2.36%) fall well short of the percentages in cases in which the Supreme Court determined that a prima facie fair-cross-section violation had been made out.  See, e.g., Duren, 439 U.S. at 365-66 (39% absolute disparity); Castaneda v. Partida, 430 U.S. 482, 486-87 & n.7 (1977) (40% absolute disparity); Jones v. Georgia, 389 U.S. 24, 24 n.* (1967) (14.7% absolute disparity).  What is more, courts have upheld jury selection procedures with higher absolute disparities.  See, e.g., United States v. Mitchell, 502 F.3d 931, 950 (9th Cir. 2007) (4.15%); United States v. Orange, 447 F.3d 792, 798-99 (10th Cir. 2006) (3.57%); United States v. Royal, 174 F.3d 1, 10 (1st Cir 1999) (2.97%); United States v. Clifford, 640 F.2d 150, 155 (8th Cir. 1981) (7.2%); United States ex rel. Barksdale v. Blackburn, 639 F.2d 1115, 1126-27 (5th Cir. 1981) (11.5%).  Indeed, "[c]ourts addressing the question of whether a given absolute disparity constitutes 'substantial underrepresentation' have held that absolute disparities between 2.0% and 11.5% do not constitute substantial underrepresentation."  Ramseur v. Beyer, 983 F.2d 1215, 1232 (3d Cir. 1992) (footnote omitted).  Similarly, courts have upheld

52

jury selection procedures with higher comparative disparities than those asserted in this case (22.05% and 31.51%).  See, e.g., Orange, 447 F.3d at 798 (ranging from 38.17% to 51.22%); United States v. Weaver, 267 F.3d 231, 243 (3d Cir. 2001) (ranging from 40.01% to 72.98%); United States v. Chanthadara, 230 F.3d 1237, 1257 (10th Cir. 2000) (ranging from 40.89% to 58.39%); Royal, 174 F.3d at 10 n.10 (60.9%).

Because neither the absolute nor comparative disparities presented here establish the second element of a prima facie fair-cross-section claim, we conclude that the circuit court did not err in denying Prieto's motion to strike the qualified jury list.

### O.  Statutory Review

Under Code § 17.1-313(C), we are required to conduct a review to determine (1) "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor," and (2) "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  This review is undertaken to "'assure the fair and proper application of the death penalty statutes in this Commonwealth and to instill public confidence in the administration of justice.'" Morva v. Commonwealth, 278 Va. 329, 354, 683 S.E.2d 553, 567 (2009) (quoting Akers v. Commonwealth, 260 Va. 358, 364, 535

S.E.2d 674, 677 (2000)), cert. denied, ___ U.S. ___, 131 S.Ct. 97 (2010).

1.  Passion, Prejudice, or Any Other Arbitrary Factor

Even though Prieto does not assign error or provide any argument for this portion of the statutory review, we must still conduct the review.  Gray v. Commonwealth, 274 Va. 290, 303, 645 S.E.2d 448, 456 (2007), cert. denied, 552 U.S. 1151 (2008). Based on our review of the record and consideration of the arguments presented, we find no basis to conclude that the jury was influenced by passion, prejudice, or any other arbitrary factor in sentencing Prieto to death.

2.  Excessive or Disproportionate Sentence

As for this portion of the statutory review, Prieto simply argues that his death sentences were excessive and disproportionate based on "the incredible mitigation evidence" he presented, "the dubiousness of guilt," and "the Commonwealth's improper demand for justice in its closing argument."  In light of our discussion above and our previous holding that "the evidence [was] sufficient to prove beyond a reasonable doubt that Prieto was the immediate perpetrator of the murders of Raver and Fulton," Prieto I, 278 Va. at 401, 682 S.E.2d at 928, we find no merit in Prieto's contention.

This does not end our statutory review, however, for we must still "determine whether other sentencing bodies in this

54

jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." Lovitt, 260 Va. at 518, 537 S.E.2d at 880 (internal quotation marks and citation omitted). This review "is not designed to [e]nsure complete symmetry among all death penalty cases." Porter v. Commonwealth, 276 Va. 203, 267, 661 S.E.2d 415, 448 (2008) (internal quotation marks and citation omitted), cert. denied, ___ U.S. ___, 129 S.Ct. 1999 (2009). "Rather, the goal of the review is to determine if a sentence of death is aberrant." Id. (internal quotation marks and citation omitted).

In undertaking this review, we have looked at similar cases in which, after a finding of both aggravating factors of future dangerousness and vileness, a death sentence was imposed (1) for the willful, deliberate, and premeditated killing of a person during the commission of, or subsequent to, a rape (Code § 18.2-31(5)), see, e.g., Hedrick v. Commonwealth, 257 Va. 328, 513 S.E.2d 634, cert. denied, 528 U.S. 952 (1999); Payne v. Commonwealth, 257 Va. 216, 509 S.E.2d 293 (1999); Swisher v. Commonwealth, 256 Va. 471, 506 S.E.2d 763 (1998), cert. denied, 528 U.S. 812 (1999); Barnabei v. Commonwealth, 252 Va. 161, 477 S.E.2d 270 (1996), cert. denied, 520 U.S. 1224 (1997), and (2) for the willful, deliberate, and premeditated killing of more than one person as part of the same act or transaction (Code § 18.2-31(7)). See, e.g., Juniper v. Commonwealth, 271 Va. 362,

55

626 S.E.2d 383, <u>cert. denied</u>, 549 U.S. 960 (2006); <u>Winston v. Commonwealth</u>, 268 Va. 564, 604 S.E.2d 21 (2004), <u>cert. denied</u>, 546 U.S. 850 (2005); <u>Hudson v. Commonwealth</u>, 267 Va. 29, 590 S.E.2d 362 (2004) (guilty plea entered); <u>Zirkle v. Commonwealth</u>, 262 Va. 631, 553 S.E.2d 520 (2001) (guilty plea entered); <u>Bramblett v. Commonwealth</u>, 257 Va. 263, 513 S.E.2d 400, <u>cert. denied</u>, 528 U.S. 952 (1999); <u>Goins v. Commonwealth</u>, 251 Va. 442, 470 S.E.2d 114, <u>cert. denied</u>, 519 U.S. 887 (1996); <u>Burket v. Commonwealth</u>, 248 Va. 596, 450 S.E.2d 124 (1994), <u>cert. denied</u>, 514 U.S. 1053 (1995); <u>Stewart v. Commonwealth</u>, 245 Va. 222, 427 S.E.2d 394, <u>cert. denied</u>, 510 U.S. 848 (1993). We have also reviewed those cases in which similar convictions occurred but a sentence of life imprisonment was imposed. Based on this review, we find that Prieto's capital sentences were neither excessive nor disproportionate to sentences imposed in capital murder cases for comparable crimes.

## III. CONCLUSION

For the foregoing reasons, we find no reversible error in the judgment of the circuit court. Furthermore, we find no reason to commute or set aside the sentences of death. We thus will affirm the circuit court's judgment.

<u>Affirmed.</u>